Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/16/2025 08:07 AM CDT

State of Nebraska, appellee, v.
Carlos Corral, appellant.
___ N.W.3d ___

Filed May 16, 2025.    No. S-23-898.

1. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

2. **Effectiveness of Counsel: Appeal and Error.** In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

3. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Constitutional Law: Criminal Law: Jury Trials: Appeal and Error.** Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.

6. **Constitutional Law: Effectiveness of Counsel.** A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.

7. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

8. \_\_\_\_: \_\_\_\_. To show deficient performance under the test described in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

9. **Effectiveness of Counsel: Trial.** Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance.

10. **Trial: Attorneys at Law.** Trial counsel is afforded due deference to formulate trial strategy and tactics.

11. **Effectiveness of Counsel: Trial: Appeal and Error.** Appellate courts do not use perfect hindsight to criticize unsuccessful trial strategies. Rather, they must assess trial counsel's performance from counsel's perspective when counsel provided the assistance.

12. **Effectiveness of Counsel: Presumptions: Appeal and Error.** There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess counsel's reasonable strategic decisions.

13. **Effectiveness of Counsel: Trial: Appeal and Error.** It is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal.

14. **Effectiveness of Counsel: Proof: Appeal and Error.** In addressing the "prejudice" component of the test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.

15. \_\_\_\_: \_\_\_\_: \_\_\_\_. To show prejudice under the "prejudice" component of the test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different.

16. **Effectiveness of Counsel: Proof: Words and Phrases.** A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

17. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the

defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

18. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the issue.

19. \_\_\_\_: \_\_\_\_: \_\_\_\_. The record on appeal is sufficient to effectively review the question of ineffective assistance if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

20. **Constitutional Law: Criminal Law: Trial: Joinder.** There is no constitutional right to a separate trial on different charges.

21. **Criminal Law: Joinder: Presumptions.** A clear presumption exists in favor of a joinder of offenses and against severance.

22. **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.

23. **Trial: Joinder: Proof.** Because the joinder of related offenses is intended to promote the goals of trial convenience and judicial economy, a significant consideration in making the judgment that the offenses are sufficiently related is that there is a large area of overlapping proof.

24. **Joinder: Words and Phrases.** For purposes of Neb. Rev. Stat. § 29-2002(1) (Reissue 2016), "connected together" means connected in any reasonable manner.

25. **Trial: Joinder.** To determine if charges are "connected together" to be joinable under Neb. Rev. Stat. § 29-2002(1) (Reissue 2016), courts weigh the totality of the circumstances in light of broadly construing permissive joinder to promote trial economy and judicial efficiency, considering relevant circumstances that include the temporal and spatial concurrence of the offenses, the concurrence of their investigation and related discovery of evidence, the logical link between the offenses, and the overlap of material witnesses.

26. **Joinder: Proof: Appeal and Error.** While Neb. Rev. Stat. § 29-2002 (Reissue 2016) presents two separate questions, there is no error under either subsection (1) or (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown.

27. **Trial: Joinder: Proof.** A defendant opposing joinder of charges must meet a high burden of proving prejudice. To carry that burden, the

defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.

28. **Trial: Joinder: Appeal and Error.** An appellate court will find the district court abused its discretion in denying a motion to sever only if the joinder caused the defendant substantial prejudice amounting to a miscarriage of justice.

29. **Joinder: Proof: Appeal and Error.** The prejudice that a defendant must demonstrate to establish the trial court abused its discretion in overruling a request to sever charges is not merely a better chance of acquittal in separate trials or spillover of evidence from one count to another. The defendant must have been deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.

30. **Joinder: Appeal and Error.** Various factors are considered in determining prejudice under Neb. Rev. Stat. § 29-2002(3) (Reissue 2016), including (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.

31. **Trial: Joinder: Proof: Testimony.** Severance will be considered on the ground of interference with a defendant's right to testify only when the defendant makes a convincing showing that the defendant has important testimony to give on one charge while having a strong need to refrain from testifying on another charge.

32. **Trial: Joinder: Evidence: Other Acts.** A judge's discretion to deny severance is broader than his or her discretion to admit uncharged misconduct evidence.

33. **Jury Instructions.** Even when the risk of prejudice is high, a court's limiting instructions often will suffice to cure any risk of prejudice.

34. **Effectiveness of Counsel.** Defense counsel is not ineffective for failing to make an objection that has no merit.

35. **Trial: Joinder: Pretrial Procedure.** If a defendant believes that there has been a prejudicial joinder, it is not enough for the defendant to file a pretrial motion to sever; the defendant must renew the objection at the close of all the evidence.

36. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** An appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.

37. **Rules of Evidence: Other Acts.** Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner.

38. ____: ____. Evidence of other crimes which is relevant for any purpose other than to show the actor's propensity is admissible under Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024).

39. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court's analysis under Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.

40. **Hearsay.** Statements are not hearsay to the extent they are offered for context and coherence of other admissible statements or to explain the course of a series of events.

41. ____. Statements are not hearsay if the proponent offers them to show their impact on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.

42. **Hearsay: Police Officers and Sheriffs.** Statements made to law enforcement to explain the steps taken in an investigation of a defendant, rather than to prove the truth of the matter asserted, are generally admissible as nonhearsay so long as the probative value of the evidence's nonhearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by an impermissible hearsay use of the statements.

43. **Rules of Evidence: Hearsay: Sexual Assault: Minors.** Statements made by a child victim of sexual abuse to a forensic interviewer in the chain of medical care may be admissible under Neb. Rev. Stat. § 27-803(3) (Cum. Supp. 2022), even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes.

44. **Trial: Convictions: Evidence: Appeal and Error.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

45. **Evidence.** Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.

46. **Effectiveness of Counsel.** Decisions about whether to engage in cross-examination, and, if so, to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.

47. **Trial: Expert Witnesses.** There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert.

48. ____: ____. Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value.

49. ____: ____. A witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.

50. **Trial: Witnesses.** Generally, to be admissible, a lay witness' opinion must be based on the witness' perception, foundation must establish a rational basis for the opinion, and the testimony must be helpful to the trier of fact.

Appeal from the District Court for Douglas County: Katie L. Benson, Judge. Affirmed.

Michael J. Wilson, of Berry Law Firm, for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

The defendant was convicted by jury of three counts of sexual assault of a child in the first degree and one count of child abuse. The defendant's sexual assault and child abuse charges were tried together and arose from the defendant's alleged abuse of his girlfriend's two young daughters, with one having been sexually assaulted and the other having been physically abused. On appeal, the defendant has new counsel and argues that his trial counsel provided ineffective assistance by failing to object to the joinder of his charges and move to sever, failing to request a limiting instruction, failing to object to witness testimony, and failing to impeach a witness. The defendant further argues the district court erred in overruling his objection to witness testimony. He requests

a new trial due to the cumulative prejudicial effect of the alleged ineffective assistance and the court's ruling on his objection.

## II. BACKGROUND

### 1. Background and Procedural History

In 2022, Carlos Corral was charged in an amended information with three counts of sexual assault of a child in the first degree, a Class IB felony, and one count of child abuse, a Class IIIA felony. The charges stemmed from Corral's alleged abuse of two victims, M.R. and E.R., that occurred on or about March 16 through April 15, 2016.

Corral, who was over the age of 19 and born in November 1972, allegedly subjected M.R., who was 7 years old, to sexual penetration on several occasions. Corral also allegedly physically abused E.R., who was 6 years old, several times during this same time period. M.R. and E.R.'s mother had been dating and living with Corral in Omaha, Nebraska, during the time of the alleged crimes.

Corral's three sexual assault charges and single child abuse charge were tried together. The alleged commission of the crimes occurred when Corral was watching M.R. and E.R. while their mother worked a second, part-time job for 3 hours three nights a week. M.R. witnessed the abuse of E.R. E.R., in turn, witnessed Corral's taking M.R. out of the girls' shared bedroom into Corral's bedroom and M.R.'s appearing upset upon her return sometime later. The girls did not disclose the abuse until 2021, when E.R. initially reported the physical abuse during a forensic interview focused on E.R.'s knowledge of M.R.'s sexual abuse.

The theory of the defense was that the girls' memories were unreliable, the criminal acts the girls allegedly remembered were fabricated by the mother, and Corral lacked the opportunity to commit the crimes. The defense emphasized at trial that the State had failed to produce independent verification of the mother's part-time employment and of Corral's ever having babysat M.R. and E.R.

Corral's trial counsel did not object to the joinder, move to sever the charges, or request a limiting instruction. However, the court instructed the jury that it "must come to a separate decision regarding each crime."

Following trial, the jury returned guilty verdicts on all four counts. The court sentenced Corral to imprisonment for 25 to 30 years for each sexual assault conviction and for 2 to 3 years for the child abuse conviction. The court ordered Corral's sentences to be served concurrently.

## 2. Evidence at Trial

The evidence at trial consisted primarily of witness testimony. Corral did not testify in his defense.

### (a) Prosecution

The State called eight witnesses on direct: M.R., E.R., their mother, the officer who received the initial report of abuse, the two officers who investigated the report, and a forensic interview specialist who interviewed the girls. The State called one rebuttal witness, a nurse practitioner. At the time of trial, M.R. was 14 years old and E.R. was 13 years old.

### (i) Mother's Second Job and Corral's Babysitting

M.R. and E.R.'s mother testified that in March 2016, she started a full-time job at a cleaning company where she worked from 8 a.m. to 5 p.m. Around April 2016, she started a second job with a cleaning company where she worked part time from 5 to 8 p.m. on Mondays, Wednesdays, and Fridays. She testified that the part-time evening job lasted for about a month. The mother testified that her supervisor for both jobs was Nancy Gomez (Nancy) and that Nancy worked the same hours as the mother did during that time. M.R. testified that her mother's evening job was at a hotel.

The mother testified that M.R. and E.R. were at school or their school's after-school program until she picked them up after work. The mother testified that on days she worked from

5 to 8 p.m., M.R. and E.R. were left in Corral's care after she dropped them off at home. The mother testified that no one other than Corral would watch M.R. and E.R. while she was at her part-time job.

Officer Nicole Walker testified that in her investigation, she was able to confirm the mother's report of her employment during the period of the alleged abuse. Walker testified that she contacted the mother's previous relevant employers to verify her employment and dates and hours of work. Walker affirmed that she had spoken to "people" at both businesses and had "receive[d] confirmation that [the mother] did work there during those relevant periods of time." Walker also affirmed that the information she received was "consistent with the hours that were reported to [Walker] by [the mother]." On cross-examination, Walker testified that she verified the mother's employment with "Mary Jo" at "M & A Enterprises." Walker learned that the mother had been employed there from March 16 to April 15, 2016, and worked from about 6 to 9 p.m. Walker testified that the mother's hours of employment for "KB Building Services" were "day shift hours," which she thought were between 8 a.m. and 4 p.m. Walker learned that the mother worked there later in 2016 and denied that the mother had both jobs at one time.

### (ii) M.R.'s Testimony of Sexual Abuse

M.R. testified that after she would return home from school and while her mother was at work, Corral would take her into his bedroom and do "a lot of things" to her. During those times, the only people in the house were Corral, M.R., and E.R.

M.R. testified that she would be in her room with E.R. when Corral would come in and ask to "borrow [M.R.]." M.R. explained that E.R. witnessed Corral asking to "borrow" her. After Corral would take her to the bedroom, he would tell her to remove her clothes, take off his own clothes, and tell her not to tell anyone.

M.R. testified that Corral would penetrate her vaginally and that her "vagina hurt" when he did so. When Corral was

on top of her, he would grunt or moan. M.R. would often cry. M.R. testified that Corral would also put her in what he called "the doggie position," where she would be on her hands and knees and Corral would anally penetrate her. Corral would also penetrate her mouth with his penis. When Corral would do so, M.R. felt like she was suffocating and would cry. M.R. would sometimes throw up afterward.

After these assaults, M.R. would be crying, and Corral would tell her to be quiet or he "would end up doing something to [her]." Corral would also tell her not to tell anyone or he would harm the mother. M.R. would not be allowed to leave the room until Corral gave her permission.

In response to the State's questions, M.R. denied that she saw anything on or saw anything come out of Corral's penis after the penetration, except for her saliva after oral penetration.

M.R. testified that Corral brought her into the bedroom on multiple days for over a month and stopped only when the mother quit her job. M.R. was unable to identify Corral, who was sitting at counsel's table in the courtroom.

### (iii) M.R.'s Testimony of Corral's
### Physical Abuse of E.R.

M.R. testified that she witnessed Corral's hitting E.R., who was 6 years old at the time. According to M.R., Corral would hit E.R. in the back, arm, and face with his hands, a belt, and a coathanger. Corral would also throw a shoe at E.R. After E.R. would get hit, M.R. would see E.R. cry and observed bruises on E.R.'s back and arms. M.R. saw this happen every week that Corral had been with them, and it continued during the time Corral would also sexually assault M.R. Corral never hit M.R. like he would hit E.R.

### (iv) E.R.'s Testimony of Corral's
### Sexual Abuse of M.R.

E.R. testified, like M.R., that there were times where M.R. and she were alone with Corral after school while their mother worked. E.R. said that on more than five occasions, Corral

came into M.R.'s and her bedroom after the mother left for work and would take M.R. to his bedroom. The door to Corral's bedroom would be closed. E.R. observed M.R. looking "distant" and upset after she would leave the bedroom.

### (v) E.R.'s Testimony of
### Corral's Physical Abuse

E.R. testified that Corral would slap, hit, and punch her using mainly his hands, but that he also hit her with a belt and would throw shoes and a "wood[en] elephant" at her. E.R. recalled a time where Corral hit her around her nose, which felt like it had broken, though it had not. E.R. would cry due to the physical abuse and would develop some redness and bruises afterward. E.R. said the physical abuse occurred "probably twice a week or once," with it starting 2 or 3 months after the girls and their mother moved in with Corral. Some of the incidents of physical abuse occurred during the same timeframe as the sexual assaults.

### (vi) Mother's Testimony of Physical Abuse
### of E.R. and Other Observations

M.R. and E.R.'s mother testified that she witnessed Corral hit E.R. with a belt and saw E.R. cry afterward. She was uncomfortable with how Corral had disciplined E.R. and told him not to discipline her in that way, which Corral agreed not to do again.

The mother recounted that neither M.R. nor E.R. ever wanted to spend time with Corral and that they seemed intimidated by him. In February 2017, the mother's relationship with Corral ended for unrelated reasons, and she, M.R., and E.R. moved away from Omaha. The mother testified that after they moved, she noticed that E.R.'s behavior improved and both girls were happier.

### (vii) Aunt's Testimony

M.R. and E.R.'s aunt, their mother's sister, lived with M.R., E.R., the mother, and Corral from July to October 2016. She

testified that she observed that the girls tried not to make Corral angry or upset and tried to keep their distance from him.

### (viii) Move and Initial Disclosure
### of Sexual Abuse

In 2021, approximately 5 years after the alleged abuse, M.R. disclosed the sexual assaults for the first time by telling E.R. about what Corral had done to her in the bedroom. Later that same year, the mother had a conversation with M.R. and E.R. about letting her know if someone touched them inappropriately, and E.R. helped M.R. share what had happened to her. The mother affirmed that at some point after her relationship with Corral ended, "[M.R.] talk[ed] to [her] about something that had happened, that [Corral] had done to [M.R.]"

The mother testified that during the conversation, "[E.R.] told [M.R.] that it was okay, that it was time for her to tell." After E.R. tried to get M.R. to tell their mother about the sexual assaults, the mother asked who touched M.R. The mother asked M.R. and E.R. about her partner at the time, and "they said, [']No, it wasn't him.[']" She then asked about a different man whom they view as their father, and "they said no." The mother asked whom the perpetrator was, and "[E.R.] said, ['] . . . Corral, it was [Corral].[']" The mother asked M.R. to confirm it was Corral who had committed the assaults, and "[M.R.] said, [']Yes,[']" while crying. The mother asked M.R. if she was sure it was Corral, and "[M.R.] said, [']Yes.[']" The mother asked M.R. why M.R. and E.R. did not tell her sooner, and "[t]hey said, [']Well, you weren't with Carlos anymore, so [they] felt there was no reason for [us] to tell you.[']"

### (ix) Law Enforcement Testimony Regarding
### Initial Report of Abuse

After this conversation, M.R., E.R., and their mother went to a police station and made a report. A Madison County sheriff's office lieutenant, Jon Downey, testified that the mother reported M.R.'s alleged sexual assaults to him. Downey testified that "[the mother] said that she had been talking with

her daughters recently about the difference between good touch and bad touch, and that [E.R.], the younger of the two girls, had encouraged [M.R.] to tell [the mother] about the things that had happened to [M.R.] in the past."

Downey testified that the mother told him

her daughters had told her that this had happened while [she] was at work, and she said that . . . when [she] and . . . Corral lived together, the only time that she could work outside of the home . . . was a few months in 2016, when she worked at a hotel, and so that, to their knowledge, that's when this would have happened.

Through the mother's report, Downey learned that the alleged assaults occurred at "1509 Willis" in Omaha. He testified that "[the mother] also said that [Corral] was currently living at the house next door to where the abuse had happened in Omaha."

### (x) Testimony of Forensic Interviewer Recounting Interview

When M.R. and E.R. were later interviewed about M.R.'s alleged sexual assaults, E.R. disclosed the alleged physical abuse by Corral. A forensic interviewer, Sarah Scheinost, testified that she conducted two interviews with M.R. at a child advocacy center, following the report of sexual abuse to law enforcement. Scheinost testified that both M.R. and E.R. were interviewed and shared the allegations of abuse.

Scheinost stated there had been a child abuse hotline report and that she believed "[M.R.] had disclosed some sexual abuse to [E.R.] and then [their mother]" before the mother took M.R. to the police station. When asked about the purpose of M.R.'s initial forensic interview, Scheinost responded, "[M.R.] had disclosed, like I said, some sexual abuse." Scheinost affirmed that "[M.R.] provide[d] a disclosure of abuse" during her initial interview.

Scheinost also testified that she conducted an interview with E.R. When asked why E.R. was brought in for an interview,

Scheinost explained that she did not know why, adding, "[E.R.] was referred to us, but I do know that [M.R.] had disclosed to [E.R.]" Scheinost affirmed that "[E.R.] provide[d] a disclosure of abuse" during her interview.

### (xi) Walker's and Scheinost's Testimony of Delayed Disclosure

Both Walker and Scheinost testified generally about children's delayed disclosures of abuse.

Walker had been employed with the Omaha Police Department for a total of 21 years. At the time of trial, she had been working in the department's child-victim sexual assault unit for about 2½ years. Walker had approximately 20 to 25 open sexual assault cases at any given time. Walker received training relating to sexual assault and child abuse cases through a police academy, "Project Harmony," and the child advocacy center. Walker usually received 2 days of training each year and was required to participate in about 20 hours of training per year outside of the academy.

Scheinost has a bachelor's degree in human service counseling and a master's degree in education. She had been working for 7 years at a local hospital as a forensic interview specialist. She had received specialized training in forensic interviewing of children, including delayed disclosures. She had conducted at least 2,000 forensic interviews.

Scheinost testified that research shows that a "vast majority of children delay disclosing sexual abuse or don't disclose at all." Based on her training and experience, Scheinost said that some reasons why children may delay their disclosure or not disclose at all are shame, embarrassment, and fear of the perpetrator's threats to them or to hurt their parent. She described different types of disclosure of abuse and explained that children may become ready to disclose when (1) a perpetrator is no longer in the home or has access to them, (2) they are of the age to understand that the abuse should not have happened, or (3) they feel supported by a nonoffending

parent. She said that disclosure can be more challenging when abuse happens repeatedly over time, as opposed to being an isolated incident, because with repeated abuse, "it all kind of just blurs together . . . and there aren't a lot of details, it's just these things happened, and so they disclose it kind of altogether [sic]." Defense counsel did not object to Scheinost's testimony.

Walker was asked if, in her experience, it is uncommon to investigate crimes of sexual abuse where there is a disclosure of abuse that is delayed by years, and Walker responded that it is "very common." Defense counsel did not object. Thereafter, the prosecution asked, "How common would you say it is as it relates to your cases?" Defense counsel objected to the question on the grounds that it called for expert witness testimony and speculation. The court overruled the objection, and Walker answered that, in her personal experience, "at least 75 percent of [her] cases" had a delayed disclosure component to them. Corral's trial counsel did not object to any of Walker's testimony based on foundation. None of trial counsel's objections at trial to any of the evidence were made under Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024) or based on hearsay.

The State later called a rebuttal witness, a nurse practitioner trained and experienced in medical examinations of children for suspected abuse and neglect. She testified that she would not expect to observe any signs of physical injury 5 years after incidents of oral, anal, and vaginal penetration of a child.

### (xii) Interview of Corral

Walker and another law enforcement officer testified that they interviewed Corral and that he was residing next door to where the sexual abuse and physical abuse were alleged to have occurred. During Corral's interview, he stated he was never home and worked all day. He denied ever being left alone with M.R. and E.R., either of them ever being in his bedroom, or ever having any physical contact with them other than "high fives."

### (b) Defense

Defense counsel used M.R.'s deposition to attempt to impeach her testimony regarding matters such as the color of the house in which the alleged abuse occurred, Corral's personality, where M.R. was after school and on the weekends, and how many days her mother worked per week in March and April 2016. During cross-examination of M.R., defense counsel adduced that when her mother and Corral went out at night, M.R. and E.R. would sometimes go to "Nancy's" house.

During cross-examination of Downey, defense counsel adduced that Downey did not obtain information about where the mother was allegedly working during the alleged abuse, or who her supervisor was. And in cross-examining Walker, defense counsel demonstrated that Walker did not obtain a written report from the mother's former employer documenting her part-time night hours and that the company was no longer in business.

In cross-examining the girls' aunt, defense counsel adduced that the girls often heard their mother and Corral loudly having sexual intercourse. The aunt also testified on cross-examination that when she called M.R. and E.R.'s mother between March 15 and April 15, 2016, most of the time she was available.

Defense counsel called five witnesses, consisting of Corral's sister and four of Corral's friends. Corral's sister stayed at Corral's house for several months beginning in the middle of April 2016. She observed M.R. and E.R. around Corral and testified that their demeanor was normal. She observed that Corral had a good relationship with M.R. and E.R., and she never saw anything abnormal. However, Corral was not home very often. She testified that Corral was never alone with M.R. and E.R.

Corral's sister testified she is a nurse with experience seeing children who have been sexually penetrated. She testified that such children usually bleed. At no point during her stay with Corral did M.R. or E.R. report bruising, bleeding, or pain, and she did not observe any bruising or bleeding.

A friend of Corral's called by the defense testified that Corral did not seek the company of women who had small children and was always very careful about having age-appropriate relationships. The friend never saw Corral so inebriated that he would act inappropriately.

A different friend of Corral's described how she lived with her three young children in Corral's basement shortly before the alleged assaults. She testified that Corral did not want to babysit her children and did not make efforts to be around them.

Yet another friend testified for the defense that M.R. and E.R.'s mother was not working in March 2016. She testified that she knew this because she and the mother had regular contact in the evening hours by telephone.

The third friend of Corral's who testified as a witness for the defense was Nancy. She said that she was living in the same house as Corral during the time of the alleged assaults and that she was certain M.R. and E.R.'s mother was not working in April 2016. She also testified that while living there, she babysat M.R. and E.R.; Corral did not babysit them. Before she moved in, her daughter or aunt babysat the girls. She testified that she could hear everything that happened in the house from her bedroom. Sometimes M.R. and E.R. would go to Nancy's room because their mother was being "very noisy during the activities with [Corral]." Nancy said that Corral often was not home.

Defense counsel adduced testimony from several of the witnesses indicating that M.R. and E.R.'s mother was not very attentive to the girls and that she had a bad relationship with Corral.

## III. ASSIGNMENTS OF ERROR

Corral assigns 10 errors, with errors Nos. 1 through 7 and 9 alleging ineffective assistance of counsel.

In errors Nos. 1 and 2, Corral assigns trial counsel provided prejudicial ineffective assistance by failing to (1) object to joinder and move to sever the sexual assault charges from the

child abuse charge, because the sexual assault evidence would not have been admissible in a separate trial on the child abuse charge and vice versa, and (2) request limiting instructions prohibiting the jury from considering the sexual assault evidence when weighing the child abuse charge and vice versa.

In errors Nos. 3 through 6, Corral assigns trial counsel provided prejudicial ineffective assistance by failing to object to hearsay in the testimonies of multiple witnesses, specifically (3) hearsay testimony from the mother regarding statements M.R. and E.R. allegedly made when disclosing the abuse to her; (4) hearsay and double hearsay testimony from Downey regarding statements the mother, M.R., and E.R. made when they reported the alleged sexual assaults to him; (5) hearsay and double hearsay testimony by forensic interviewer Scheinost regarding M.R.'s and E.R.'s disclosures of alleged abuse during their forensic interviews; and (6) hearsay testimony from Walker that E.R. "allegedly 'disclosed physical abuse'" during her forensic interview.

In error No. 7, Corral assigns trial counsel provided prejudicial ineffective assistance by failing to object on both foundational and hearsay grounds regarding double hearsay testimony by Walker that "people" working at the mother's previous employers provided "confirmation that [the mother] did work there during those relevant periods of time" and that the information Walker received was "consistent with the hours that were reported to [Walker] by [the mother]."

In error No. 8, Corral assigns the trial court erred in overruling his objection to Walker's testimony regarding her experience that "a delay of years in . . . disclosure" of sexual abuse "is very common" and her experience that delayed disclosure occurs in "at least 75 percent of [her] cases."

In error No. 9, Corral assigns trial counsel provided prejudicial ineffective assistance by failing to impeach M.R. with her deposition testimony that she saw "white stuff" come out of his penis during the sexual assaults.

Lastly, in error No. 10, Corral assigns that a new trial is warranted due to the cumulative prejudicial effect of trial counsel's ineffective assistance and the trial court's erroneous evidentiary ruling.

## IV. STANDARD OF REVIEW

[1,2] Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.[1]

[3,4] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[2] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[3]

[5] Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo.[4]

## V. ANALYSIS

Through different counsel, Corral argues on appeal that (1) his trial counsel provided ineffective assistance in several

---

[1] *State v. Briggs*, 317 Neb. 296, 9 N.W.3d 632 (2024).

[2] *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787.

[3] *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022).

[4] *Id*.

respects, (2) the district court erred in overruling his objection during Walker's testimony, and (3) the ineffective assistance and the court's ruling caused a cumulative prejudicial effect that warrants a new trial.

We first address Corral's claims of ineffective assistance. Corral argues his trial counsel failed to (a) object to the joinder of his charges or move to sever them, (b) request a limiting instruction to prevent jurors from considering the sexual assault evidence when weighing the child abuse charge and vice versa, (c) object to testimony on hearsay grounds, (d) object to testimony on foundation and hearsay grounds, and (e) impeach M.R. with her deposition testimony regarding seeing "white stuff" come out of Corral's penis during the sexual assaults. We will address each claim in turn but first review the general principles governing ineffective assistance claims on direct appeal.

[6,7] A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.[5] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[6] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[7]

[8,9] To show deficient performance under the *Strickland* test, the defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[8] Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance.[9]

---

[5] *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015).

[6] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[7] *State v. Anders, supra* note 3.

[8] See *id*.

[9] *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021).

[10-13] Trial counsel is afforded due deference to formulate trial strategy and tactics.[10] We do not use perfect hindsight to criticize unsuccessful trial strategies.[11] Rather, we must assess trial counsel's performance from counsel's perspective when counsel provided the assistance.[12] There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess counsel's reasonable strategic decisions.[13] We have cautioned that it is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal.[14]

[14-16] In addressing the "prejudice" component of the *Strickland* test, we focus on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.[15] To show prejudice under that component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different.[16] A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.[17]

[17,18] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise

---

[10] *State v. Jackson*, 275 Neb. 434, 747 N.W.2d 418 (2008). See *State v. Anders, supra* note 3.

[11] *State v. Wood, supra* note 9.

[12] *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

[13] *State v. Anders, supra* note 3. See, also, *State v. Betancourt-Garcia*, 317 Neb. 174, 9 N.W.3d 426 (2024); *State v. Jackson, supra* note 10.

[14] *State v. Wood, supra* note 9.

[15] *State v. Iromuanya, supra* note 12.

[16] *State v. Huston, supra* note 5.

[17] *Id*.

on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[18] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[19] The determining factor is whether the record is sufficient to adequately review the issue.[20] In other words, the record must be sufficient to address the claim without an evidentiary hearing.[21]

[19] The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[22] We have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the "rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial."[23] Even when we have expressed skepticism that any reasonable trial strategy could be revealed through an evidentiary hearing, we have held that the record on direct appeal was insufficient to address the ineffective assistance claim.[24]

This is consistent with other jurisdictions and legal authority. It has been said that it is possible to find ineffective

---

[18] *State v. Anders, supra* note 3.

[19] *Id.*

[20] See *id.*

[21] See *State v. Briggs, supra* note 1.

[22] See, *id.*; *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013).

[23] *State v. Casares*, 291 Neb. 150, 155, 864 N.W.2d 667, 672 (2015).

[24] See, *State v. Sidzyik*, 281 Neb. 305, 795 N.W.2d 281 (2011); *State v. Gonzalez-Faguaga*, 266 Neb. 72, 662 N.W.2d 581 (2003).

assistance of trial counsel on direct appeal "[o]nly in the rare case, where the deficiency of an attorney's performance is *beyond dispute* and prejudice is obvious from the existing record . . . ."[25] One court explained that to determine whether a claim of ineffective assistance of counsel is record based, such that it may be considered on direct appeal, the court must ask why counsel did or did not perform as alleged, and only if the record explains why will the court address the issue on direct appeal.[26]

### 1. Failure to Object to Joinder and Move to Sever

Corral asserts trial counsel was ineffective by failing to object to joinder of the charges and move to sever them. Corral's trial counsel's failure to object at trial or move to sever waived any claim of trial court error,[27] and Corral does not assert the joinder was plain error.[28] Nevertheless, the principles governing when a trial court errs in permitting the joinder of charges are relevant to Corral's assertion that trial counsel was ineffective.

### (a) Liberal Joinder for Efficient Administration of Criminal Trials

[20] "Joinder of multiple offenses for a single trial is favored and is the rule rather than the exception in criminal cases."[29] There is no constitutional right to a separate trial on different charges.[30]

---

[25] 24 C.J.S. *Criminal Procedure and Rights of Accused* § 2119 at 85 (2016) (emphasis supplied).

[26] 24 C.J.S., *supra* note 25.

[27] See *Stapleman v. State*, 150 Neb. 460, 34 N.W.2d 907 (1948).

[28] See *Peterson v. Brandon Coverdell Constr., ante* p. 342, 15 N.W.3d 698 (2025).

[29] 22A C.J.S. *Criminal Procedure and Rights of Accused* § 534 at 289-90 (2016).

[30] See *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[21] The joinder or severance of charges for trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2016), which, like under federal law and similar statutes in most states, expresses a rule of liberal joinder of offenses to achieve judicial economy.[31] "A clear presumption exists in favor of a joinder of offenses and against severance."[32]

[22] Section 29-2002 states in relevant part:

(1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

. . . .

(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order an election for separate trials of counts, indictments, informations, or complaints . . . or provide whatever other relief justice requires.

We have explained that because of similarities between § 29-2002 and federal rules relating to severance of previously joined trials, federal case law is instructive in determining when severance should be granted.[33] Federal courts have held that this statutory language is to be construed broadly in favor of joinder, in the interest of more efficient administration

---

[31] See, e.g., *State v. Langston*, 889 S.W.2d 93 (Mo. App. 1994); *State v. Hentz*, 32 Wash. App. 186, 647 P.2d 39 (1982), *reversed on other grounds* 99 Wash. 2d 538, 663 P.2d 476 (1983); 42 C.J.S. *Indictments* § 218 (2017); Milton J. Hernandez IV, *Missing the Misjoinder Mark: Improving Criminal Joinder of Offenses in Capital-Sentencing Jurisdictions*, 111 J. Crim. L. & Criminology 651 (2021).

[32] 22A C.J.S., *supra* note 29 at 290.

[33] *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013).

of criminal trials.[34] Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.[35]

### (i) Sufficiently Related

[23] Because the joinder of related offenses is intended to "promote the goals of trial convenience and judicial economy," a significant consideration in making the judgment that the offenses are sufficiently related is that "there is a large area of overlapping proof."[36] Joinder of sufficiently related charges benefits both the prosecution and the defendant.

For the prosecution, a single trial avoids duplication of evidence and inconvenience to victims and witnesses, minimizes the time required to dispose of the offenses, and permits "a variety of other economies in connection with prosecutorial and judicial resources."[37]

For the defendant, a single trial "will eliminate the harassment, trauma, expense, and prolonged publicity of multiple trials, . . . may result in a faster disposition of all cases, may increase the possibility of concurrent sentences in the event of conviction, and may prevent the application of enhanced sentencing statutes."[38] Furthermore, defense counsel may wish to avoid giving the State "two bites at the apple."[39] For

---

[34] See, *Haggard v. United States*, 369 F.2d 968 (8th Cir. 1966); *United States v. Hopkinson*, 631 F.2d 665 (10th Cir. 1980); *U.S. v. Hersh*, 297 F.3d 1233 (11th Cir. 2002).

[35] *State v. Garcia, supra* note 30; *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

[36] 5 Wayne R. LaFave et al., Criminal Procedure § 17.1(a) at 6 (4th ed. 2015) (internal quotation marks omitted).

[37] *Id*.

[38] *Id*.

[39] *People v. Poole*, 2012 IL App. (4th) 101017, ¶ 10, 972 N.E.2d 340, 343, 361 Ill. Dec. 855, 858 (2012).

example, "[a]n evidentiary deficiency in the first case can perhaps be cured in the second."[40] Thus, "defense counsel may choose to pursue an 'all or nothing' trial strategy, in which the defendant is acquitted or convicted of all charges in a single proceeding."[41]

### a. Same or Similar Character

Under our case law, to determine whether the charges joined for trial are of the same or similar character, we look at the underlying factual allegations.[42] Whether the charges fall under the same statute is but one factor to be considered in this analysis. "[I]f they have a 'general likeness' they are still of 'similar character.'"[43] As pointed out by the 11th Circuit Court of Appeals in *U.S. v. Hersh*,[44] "similar" in this context means "'[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness,'" and it does not require that the charges arise at the same time or out of the same series of acts or transactions.

For instance, in *State v. Knutson*,[45] we held that the charges of child abuse and child enticement through an electronic device of one victim, third degree sexual assault of a child of two other victims, and child abuse of yet another victim were all properly joined as being of the same or similar character. In all the charges in *Knutson*, the victims were of a similar age and in middle school when the misconduct occurred; the defendant occupied positions of trust, which he allegedly abused; and the misconduct was sexual in nature.

---

[40] *Id*.

[41] *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28, 75 N.E.3d 503, 511, 412 Ill. Dec. 523, 531 (2017).

[42] *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

[43] 5 LaFave et al., *supra* note 36, § 17.1(b) at 8.

[44] *U.S. v. Hersh, supra* note 34, 297 F.3d at 1241.

[45] *State v. Knutson, supra* note 42.

### b. Connected Together or
### Common Plan or Scheme

[24] The terms "connected together" or "part of a common scheme or plan" "usually come[] into play when offenses are committed over a period of time and are in some way connected to each other."[46] The "common scheme or plan" element focuses more on the motivation behind the crimes, while the "connected together" element focuses more on the time-space relationship.[47] We have not specifically elaborated on these aspects of the statute, but have quoted with approval that the standard of "connected together" means ""'"connected in any reasonable manner."'""[48]

[25] "One way in which courts determine if offenses are sufficiently 'connected' to be joined is to consider whether the charges overlap sufficiently so that the same evidence would be admissible at separate trials."[49] Courts consider the temporal and spatial concurrence of the offenses, the concurrence of their investigation and related discovery of evidence, the logical link between the offenses, and the overlap of material witnesses.[50] The totality of the circumstances is weighed in light of broadly construing permissive joinder to promote trial economy and judicial efficiency.[51]

---

[46] 2 Nancy Hollander et al., Wharton's Criminal Procedure § 11:3 at 11-28 (14th ed. 2017).

[47] 5 LaFave et al., *supra* note 36, § 17.1(a) at 4, 5 (internal quotation marks omitted).

[48] *State v. Evans*, 235 Neb. 575, 584, 456 N.W.2d 739, 745 (1990).

[49] 2 Hollander et al., *supra* note 46, § 11:3 at 11-30.

[50] See, e.g., *United States v. Park*, 531 F.2d 754 (5th Cir. 1976); *United States v. Swift*, 809 F.2d 320 (6th Cir. 1987); *United States v. Roberts*, 783 F.2d 767 (9th Cir. 1985); *United States v. Montes-Cardenas*, 746 F.2d 771 (11th Cir. 1984); *State v. Baker*, 237 Mont. 140, 773 P.2d 1194 (1989); *Hotzclaw v. State*, 2019 OK CR 17, 448 P.3d 1134 (2019); *State v. Dewhitt*, 276 Or. App. 373, 368 P.3d 27 (2016).

[51] *State v. Dewhitt, supra* note 50.

For instance, in *State v. Burke*,[52] the court held that charges against the defendant for sexual abuse of a child, dealing in material harmful to a minor (viewing pornography), and forcible sexual abuse of an adult (the aunt of the child victim) were properly joined as connected in their commission. While neither victim witnessed the abuse of the other or the pornography, all the crimes occurred on the same day and in the same place (albeit at different times). The crimes illustrated "a distinct behavioral arc of increasingly aggressive and opportunistic transgressions of sexual boundaries, apparently fueled by mounting frustration over repeatedly thwarted attempts at some level of sexual interaction with females who were physically proximate to [the defendant]."[53] Under all the circumstances, the court found that the crimes were "so related in time, location, and purpose that they are directly connected in a legally significant way."[54]

### (ii) Prejudice

[26] While § 29-2002 presents two separate questions, we have held there is no error under either subsection (1) or (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown.[55] Thus, in the recent cases of *State v. Benson*[56] and *State v. Briggs*,[57] we affirmed the trial courts' refusal to sever charges upon finding that the defendant had failed to show prejudice under subsection (3), expressly

---

[52] *State v. Burke*, 256 P.3d 1102 (Utah App. 2011).

[53] *Id*. at 1113.

[54] *Id*.

[55] *State v. Garcia, supra* note 30; *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019); *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018).

[56] *State v. Benson, supra* note 35.

[57] *State v. Briggs, supra* note 55.

holding it was unnecessary to examine whether the charges were sufficiently related to be properly joined in the first instance under § 29-2002(1).

[27,28] A defendant opposing joinder of charges must meet a high burden of proving prejudice.[58] To carry that burden, the defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.[59] An appellate court will find the district court abused its discretion in denying a motion to sever only if the joinder caused the defendant substantial prejudice amounting to a miscarriage of justice.[60]

Prejudice of the joinder of charges against the defendant is likely to fall into several categories:

"(1) [the defendant] may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if [the evidence were] considered separately[,] it would not so find."[61]

The latter two categories are described as a "'spillover effect.'"[62]

[29] The prejudice that a defendant must demonstrate to establish the trial court abused its discretion in overruling a request to sever charges is not "merely a better chance of acquittal in separate trials" or "spillover of evidence from one

---

[58] *State v. Foster, supra* note 33. See, also, *State v. Garcia, supra* note 30; *State v. Briggs, supra* note 55.

[59] *State v. Garcia, supra* note 30.

[60] *Id.*; *State v. Benson, supra* note 35; *State v. Briggs, supra* note 55.

[61] 5 LaFave et al., *supra* note 36, § 17.1(c) at 10.

[62] 3 Clifford S. Fishman, Jones on Evidence Civil and Criminal § 17:17 at 351 (7th ed. 1998).

[count] to another."[63] The defendant must have been deprived of "an *appreciable* chance for an acquittal, a chance that [the defendant] would have had in a severed trial."[64]

[30] Various factors are considered in determining prejudice under § 29-2002(3), including (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.[65]

[31] Another consideration that may become relevant to a prejudice analysis under § 29-2002(3), if properly raised, is whether the joinder will interfere with the defendant's right to testify in the defendant's own defense. Severance will be considered on the ground of interference with the defendant's right to testify only when the defendant makes a convincing showing that the defendant has important testimony to give on one charge while having a strong need to refrain from testifying on another charge.[66] Such showing must be supported by enough information regarding the testimony the defendant wishes to give, and the reasons the defendant does not want to testify on the other charge, to satisfy the trial court that the prejudice claim is genuine.[67]

[32] Prejudice from joinder generally cannot be shown if the evidence of one charge would have been admissible

---

[63] *State v. Knutson, supra* note 42, 288 Neb. at 833, 852 N.W.2d at 318 (internal quotation marks omitted).

[64] *Id*. See, also, *State v. Garcia, supra* note 30.

[65] *People v. Soper*, 45 Cal. 4th 759, 200 P.3d 816, 89 Cal. Rptr. 3d 188 (2009). See, also, e.g., *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964).

[66] See *United States v. Reicherter*, 647 F.2d 397 (3d Cir. 1981).

[67] *Id.*

in a separate trial of another charge,[68] referred to as "cross-admissibility."[69] But this does not mean that cross-admissibility of the offenses equates with joinder.[70] "The judge's discretion to deny severance is broader than his or her discretion to admit the uncharged misconduct evidence."[71]

As a result, in addition to considering cross-admissibility, we have held that joined charges do not usually result in prejudice if the evidence is sufficiently "simple and distinct" for the jury to easily separate evidence of the charges during deliberations.[72] This forms part of the premise that, with a proper charge, the jury can easily keep such evidence separate in its deliberations; therefore, the danger of the jury's cumulating the evidence is substantially reduced.[73]

[33] In *Knutson*, as an alternative ground for affirming the defendants' convictions on the joined charges of child abuse and child enticement through an electronic device as to one victim, third degree sexual assault of a child for two other victims, and child abuse of yet another victim, we held that the defendant had failed to prove prejudice under subsection (3).[74] We observed the evidence supporting each charge was simple and distinct from the evidence of other offenses, such that the jury could separate the charges and associated evidence, without combining evidence of other charges to find guilt on a charge that it would not have found if the court had ordered separate trials.[75] And the judge instructed the jury to "keep the charges separate and come to a separate decision

---

[68] *State v. Garcia, supra* note 30.

[69] 2 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 9:05 at 11-12 (rev. ed. 2001).

[70] See 2 Imwinkelried, *supra* note 69.

[71] *Id.*, § 9:05 at 12.

[72] *State v. Garcia, supra* note 30, 315 Neb. at 122, 994 N.W.2d at 661.

[73] *Drew v. United States, supra* note 65.

[74] *State v. Knutson, supra* note 42.

[75] *Id.*

regarding each charge."[76] We explained that a jury is presumed to follow its instructions.[77] We said, "[E]ven when the risk of prejudice is high, a court's limiting instructions '"often will suffice to cure any risk of prejudice."'"[78]

### (b) Constitutional Effectiveness of Corral's Trial Counsel in Not Objecting to Joinder or Moving to Sever

According to Corral, as a matter of law, his trial counsel's actions could not be justified as a part of any plausible trial strategy and the record affirmatively demonstrates he was prejudiced by the jury's hearing evidence of both crimes; therefore, we must find on direct appeal that trial counsel was ineffective. Corral argues that our opinion in *State v. Rocha*[79] mandates such a holding. We disagree.

We find the facts of *Rocha* are meaningfully different from the facts of the case at bar. We also observe that the *Rocha* majority's analysis of prejudice under subsection (3) of § 29-2002 is at odds with *Benson*[80] and *Briggs*.[81] We disapprove of *Rocha* to the extent it holds that if charges are improperly joined under subsection (1) of § 29-2002, the trial court has committed reversible error unless the State sustains its burden to demonstrate the error was harmless.

### (i) Rocha

In *Rocha*, we held on direct appeal, by a four-judge majority, that trial counsel was ineffective for failing to object to

---

[76] *Id.* at 834, 852 N.W.2d at 318.

[77] *Id.*

[78] *Id.* at 833, 852 N.W.2d at 317, quoting *State v. Foster, supra* note 33, quoting *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993).

[79] *State v. Rocha, supra* note 22.

[80] *State v. Benson, supra* note 35.

[81] *State v. Briggs, supra* note 55.

the joinder of a sexual assault charge as to one sibling with child abuse charges as to all three siblings, because we could "conceive of no strategic reason for [defense] counsel's failure to act, and that failure undermines our confidence in the outcome of the trial."[82] Two judges dissented.

The defendant in *Rocha* was charged with sexual assault of his stepdaughter, along with child abuse of his stepdaughter and three stepsons stemming from physical abuse. The information alleged the child abuse occurred from June 2008 through February 2011, a period of approximately 2 years 8 months. It alleged the sexual assault was committed over a period of approximately 1 year 4 months, from October 2009 through February 2011.

The stepdaughter testified at trial as to the sexual abuse and the defendant's having hit her with a slipper and a belt. She further testified as to the defendant's abuse of her brothers, which consisted of choking them and spanking them with a belt and a slipper. She also once saw the defendant push his fingernail into one of her brother's ears. She said she was afraid of the defendant because he hurt her brothers.

One of the brothers testified that the defendant did not hit him, but that he sometimes did not get enough food to eat. That brother also described in detail the defendant's physical abuse of the other two brothers.

None of the brothers provided any testimony relevant to the sexual abuse of the stepdaughter, apart from one brother's stating that sometimes he and his brothers were locked in the bedroom while the stepdaughter was in the living room with the defendant.

Some witnesses at trial provided testimony relevant to only the stepdaughter that dramatically illustrated the stepdaughter's trauma from the sexual abuse. The stepdaughter's teacher testified she became concerned by the stepdaughter's behavior at school when she changed from a "'bubbly'" 5-year-old to

---

[82] *State v. Rocha, supra* note 22, 286 Neb. at 263, 836 N.W.2d at 780.

a frightened child who "wanted to be perfect in doing everything," used the bathroom to wash herself 15 or 20 times each schoolday, cried due to her hunger, and "sobbed [in] fear" of going home with dirty shoes and getting in trouble.[83] Additional testimony was given by the stepdaughter's counselor, who opined that the stepdaughter's behaviors were consistent with her having suffered sexual abuse.

These witnesses did not provide testimony relevant to the charges pertaining to the three brothers. There was no limiting instruction that the jury must come to a separate decision regarding each crime.

In holding that it was presented with the rare case where the record on direct appeal plainly rebuts the presumption of reasonableness for counsel's strategic decisions, first, the majority concluded that the sexual assault charge was misjoined with the child abuse charges. In finding the charges misjoined, the majority observed the following facts: (1) Sexual assault and child abuse are meaningfully different crimes, (2) the sexual assault charge pertained only to the stepdaughter, (3) the sexual assault of the stepdaughter took place over a different period of time than the child abuse, (4) the sexual assault "occurred separately and apart from the alleged child abuse,"[84] and (5) the "[e]vidence of the child abuse did not require evidence of the sexual assaults, and vice versa."[85]

More specifically to the categories listed in subsection (1) of § 29-2002, the majority found the crimes of sexual assault and child abuse were not of the "same or similar character" because they were "different crimes," reasoning simply that "sexual assault, on its face, is sexual in nature, whereas child abuse is not."[86] Also, "[t]he sexual assault charge pertained

---

[83] *Id.* at 259, 260, 836 N.W.2d at 778.

[84] *Id*. at 267, 836 N.W.2d at 783.

[85] *Id.* at 268, 836 N.W.2d at 783.

[86] *Id.* at 267, 836 N.W.2d at 782.

only to [the stepdaughter] and [the sexual assaults] took place over a different period of time than the child abuse."[87]

The majority found under § 29-2002(1) that the sexual assault charge was not based on the "same act or transaction" as the child abuse charges, because they were not based on substantially the same facts. Further, the majority said time overlap is not enough and noted that the sexual assaults occurred separately and apart from the alleged child abuse.

Lastly, the majority found under § 29-2002(1) that the sexual assault and child abuse charges were not "connected together" or "parts of a common scheme or plan." In rejecting that the charges were "connected together," the majority concluded there was no "nexus" like what we had found in the case of *State v. Hilding*[88] to support joinder.[89] There, the sexual assaults were a frequent topic of the alleged stalking through telephone calls and the defendant admitted he called the victim to threaten her in response to her allegations of sexual assault. The majority did not state, however, that such a nexus is always necessary. The majority rejected the State's argument that there was a common scheme or plan to exercise control over the children, because the defendant "already controlled the children by virtue of being a stepparent."[90]

The majority did not evaluate prejudice under subsection (3) of § 29-2002, concluding that such an analysis was not necessary if the charges were misjoined under subsection (1). The majority stated that because the charges did not qualify under subsection (1) as joinable, "the charges were misjoined, and had a proper objection been raised by trial counsel, the court would have been required to order separate trials."[91]

---

[87] *Id.*

[88] *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009).

[89] *State v. Rocha, supra* note 22, 286 Neb. at 268, 836 N.W.2d at 783.

[90] *Id*.

[91] *Id*.

The majority thereby avoided the prejudice analysis under § 29-2002(3), citing to a federal case, *U.S. v. Chavis*,[92] and a treatise on criminal procedure.[93] The treatise states that "[w]here a misjoinder has been shown to exist, in contrast to the case in which the joinder was initially proper but a severance is sought on grounds of prejudice, it is clear that the 'trial judge has no discretion to deny a motion for severance,'" this latter internal quote coming from *Chavis*.[94] In *Chavis*, after finding that the charges were misjoined because the crimes they alleged were not the same act or transaction, of the same or similar character, connected together, or parts of a common scheme or plan, the court proceeded directly to a harmless error analysis under Fed. R. Crim. P. 52(a), for which the government had the burden of persuasion.

The majority in *Rocha* ultimately held that counsel was ineffective because the record affirmatively showed both deficient conduct and prejudice. Even though the record on direct appeal did not reflect trial counsel's reasoning or strategy, the majority held that trial counsel's failure to object to the joinder was deficient performance because it could not have stemmed from any reasonable strategic decision. The majority explained, "[B]ecause of the obvious risks to [the defendant] of proceeding with a joint trial on the charges, we can conceive of no reasonable strategic reason for counsel's failure to object and move to sever the charges."[95]

The majority then found that counsel's deficient performance prejudiced the defendant. The majority said that pursuant to Neb. Rev. Stat. §§ 27-403 (Reissue 2016) and 27-404(2), the evidence of child abuse of the stepsons would have been inadmissible in a trial on the sexual assault of the stepdaughter and vice versa, and that joining all the charges effectively

---

[92] *U.S. v. Chavis*, 296 F.3d 450 (6th Cir. 2002).

[93] 5 LaFave et al., *supra* note 36, § 17.3(a).

[94] *Id*. § 17.3(b) at 55.

[95] *State v. Rocha, supra* note 22, 286 Neb. at 269, 836 N.W.2d at 784.

prohibited the defendant from objecting to the evidence based on those statutes. The majority elaborated that the sexual assault of the stepdaughter and the child abuse of the stepsons were not inextricably intertwined and that evidence of other crimes, wrongs, or acts creates a substantial risk of a decision by the trier of fact on an improper basis.[96] The majority did not analyze, however, whether there could be a proper purpose for the cross-admissibility of any of the evidence of the respective crimes. Particularly, it did not analyze whether there was any cross-admissibility of the child abuse evidence for the proper purpose of explaining the stepdaughter's late disclosure of the sexual assaults.

The majority stated that "exacerbated by the fact that the court did not specifically instruct the jury on the importance of keeping the charges, and evidence related to those charges, separate during its deliberations," the risk was high that the jury convicted the defendant of child abuse because he committed sexual assault or convicted him of sexual assault because he committed child abuse.[97] But, in reality, the majority seemed more concerned with the spillover of the sexual assault evidence into the three charges of child abuse. The majority pointed out that the "evidence of sexual assault, by its nature, was highly volatile and had the potential to fan the jury's emotions."[98]

The majority also concluded that trial counsel was ineffective for failing to request a limiting instruction. The majority stated it did not need to know whether the defendant would have insisted on testifying in only one of two trials, had the charges been tried separately, to conclude that trial counsel was ineffective in failing to request a limiting instruction.

The dissenting opinion expressed that the record, like in "countless" other cases alleging ineffective assistance of

---

[96] See *State v. Rocha, supra* note 22.

[97] *Id.* at 270, 836 N.W.2d at 785.

[98] *Id.*

counsel on direct appeal, was insufficient for assessing the claim.[99] The dissent acknowledged the possibility that, in rare circumstances, ineffectiveness of trial counsel could be evident from the trial record alone. However, the dissent explained that an appellate court usually cannot consider ineffective assistance of counsel claims on direct appeal because a record of a criminal trial, which is devoted to issues of guilt or innocence, will not disclose the necessary facts. The dissent indicated this was especially so when the ineffective assistance of counsel alleged could involve trial strategy.

The dissent rejected what it characterized as the majority's "'we know it when we see it' approach to the question of whether counsel had no reasonable trial strategy."[100] The dissent opined that we simply did "not have the information necessary to make a principled determination of whether counsel acted, or did not act, pursuant to some reasonable trial strategy" and "should not guess or jump to the conclusion that we can 'conceive of no strategic reason' for a particular action taken by counsel during the course of a criminal trial."[101]

The dissent said the reason for the majority's inability to conceive of a strategic reason for the trial counsel's actions was "because it does not know all the facts and has eliminated the procedural means of acquiring them."[102] Moreover, the dissent suggested that one could, even under the inadequate record, conceive of facts that would support reasonable strategic reasons for not objecting to the joinder. For instance, the dissent hypothesized that trial counsel believed the best strategy for obtaining acquittal on all charges was to have a single trial, because the defendant insisted on testifying in his own defense, there was no physical evidence of any of the charges,

---

[99] *Id.* at 273, 836 N.W.2d at 786 (Stephan, J., dissenting; Cassel, J., joins).

[100] *Id.* at 276, 836 N.W.2d at 788 (Stephan, J., dissenting; Cassel, J., joins).

[101] *Id.* at 276, 277, 836 N.W.2d at 788, 789 (Stephan, J., dissenting; Cassel, J., joins).

[102] *Id.* at 279, 836 N.W.2d at 790 (Stephan, J., dissenting; Cassel, J., joins).

and counsel did not wish to give the State two opportunities to cross-examine the defendant and obtain felony convictions. The dissent further hypothesized that trial counsel may have forgone a limiting instruction because the "strategy was to characterize the children's testimony as totally lacking in credibility and therefore unworthy of the jury's consideration on any charge."[103]

### (ii) Charges Regarding M.R. and E.R. Were Joinable as "Connected Together" Under § 29-2002(1)

We find that the multiple charges of sexual assault of M.R. and the single charge of child abuse of E.R. were reasonably "connected together" to be joinable under § 29-2002(1). As such, there was no misjoinder.

Unlike in *Rocha*, there was a complete overlap in the date ranges for the crimes as charged and also in the location of their occurrence at the house.[104] Furthermore, the date ranges at issue in Corral's trial were much more limited than those presented in *Rocha.* The abuse of M.R. and E.R. allegedly occurred between the hours of 5 and 9 p.m. three nights a week for 1 month, the only time Corral was alone with them.

Unlike in *Rocha*, at Corral's trial, not a single witness or demonstrative exhibit related solely to the sexual assault charges or the child abuse charge. Rather, all the witnesses provided testimony relevant to all the charges. This included all the defense's witnesses, who generally sought to discredit the notion that Corral was alone with the girls at the times alleged, who noticed nothing concerning in the girls' behavior or physical signs of abuse, and whose testimonies suggested the girls' memories of what occurred 5 years before may have been colored by hearing their mother having sexual intercourse with Corral.

---

[103] *Id.* at 278, 836 N.W.2d at 790 (Stephan, J., dissenting; Cassel, J., joins).

[104] See *State v. Rocha, supra* note 22.

Finally, there was a concurrence of the investigations of the crimes and a strong connection between the two girls' disclosures.

In sum, there was a large area of overlapping proof and the trial economy and judicial efficiency resulting from the joinder was substantial. Weighing the totality of the circumstances liberally in favor of joinder, these facts satisfy the criteria of § 29-2002(1).

[34] Defense counsel is not ineffective for failing to make an objection that has no merit.[105] Corral's trial counsel was not ineffective for failing to object to the joinder under § 29-2002(1), because the charges were not misjoined.

### (iii) Severance Under § 29-2002(3)

[35] The next question is whether Corral's trial counsel was ineffective by failing to move to sever under § 29-2002(3). While the failure to object to the joinder of charges involves the question of whether the charges were properly joinable under § 29-2002(1), a motion for severance arises when a joinder of offenses that is proper under subsection (1) is prejudicial or becomes prejudicial before or during trial, as set forth in subsection (3).[106] It has been held that if the defendant believes that there has been a prejudicial joinder, it is not enough for the defendant to file a pretrial motion to sever; the defendant must renew the objection at the close of all the evidence,[107] since the prejudice depends on the evidence presented.

As set forth, to prove prejudice under § 29-2002(3), the defendant must have been deprived of "an appreciable chance for an acquittal, a chance that the defendant would have had

---

[105] See *State v. Allen*, 314 Neb. 663, 992 N.W.2d 712 (2023), *modified on denial of rehearing* 315 Neb. 255, 995 N.W.2d 446.

[106] See, e.g., Kevin P. Hein, *Joinder and Severance*, 30 Am. Crim. L. Rev. 1139 (1993); 22A C.J.S., *supra* note 29, § 534; 2 Imwinkelried, *supra* note 69, § 9:05.

[107] 2 Imwinkelried, *supra* note 69, § 9:05.

in a severed trial,"[108] and defense counsel is not ineffective, under either the deficiency prong or the prejudice prong, for failing to make an objection under § 29-2002(3) that has no merit.[109] A threshold similar to an "appreciable chance for an acquittal" must be met to prove the prejudice prong of the ineffective assistance inquiry in the event an objection would have had merit; i.e., to prove that there was a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[110]

For the most part, under the facts and arguments here presented, we find it appropriate to consider these two prejudice inquiries together, but they are not the same. Relevant to the appeal, as stated, a failure to move for severance under § 29-2002(3) without any reasonable trial strategy is an allegation of deficient conduct, even if it may also implicate prejudice. And Corral's argument that the joinder chilled his right to testify does not account for this fact.

### a. Right to Testify in Own Defense

Corral argues we must presume prejudice supporting a finding of ineffective assistance of trial counsel because of the alleged chilling effect joinder had on his right to testify in his own defense. But whether joinder affected his right to testify is a matter we cannot presume in the abstract.

If the right to testify was affected by the joinder, this should have been raised by Corral's trial counsel to the district court under § 29-2002(3), by presenting a showing that Corral had important testimony to give on one charge while having a strong need to refrain from testifying on another charge.[111] No such showing was made.

---

[108] See *State v. Garcia, supra* note 30, 315 Neb. at 122, 994 N.W.2d at 661. See, also, Imwinkelried, *supra* note 69, § 9:05.

[109] See *State v. Allen, supra* note 105.

[110] See *State v. Huston, supra* note 5.

[111] See *United States v. Reicherter, supra* note 66.

Without presenting the necessary showing of an effect on Corral's right to testify, even if trial counsel had moved to sever, the district court would not have considered Corral's right to testify in its § 29-2002(3) analysis and would not have erred in failing to do so. Unlike information relevant to other factors the court can consider under § 29-2002(3) in light of the anticipated evidence at trial, and reevaluate at the close of the evidence, a showing of upon which charge a defendant had important testimony to give and upon which charge the defendant had a strong need to refrain from testifying will not usually be found in the evidence at trial if the defendant does not testify.

The failure by trial counsel to make the requisite showing pertaining to the joinder's effect on the right to testify is an independent matter of both deficiency and prejudice under a claim on ineffective assistance. It is not, as Corral seems to believe, a matter pertinent solely to the prejudice prong of an ineffective assistance claim based on a general allegation that counsel was ineffective in failing to move to sever the charges.

[36] Because of this, Corral has failed to both specifically assign and specifically argue the alleged error.[112] An appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.[113] In order to preserve a claim of ineffective assistance of trial counsel when new counsel represents the defendant on direct appeal, the appellant must make specific allegations of the conduct the appellant claims constituted deficient performance by trial counsel.[114]

Corral's only argument on the point of the alleged infringement of his right to testify in his own defense is his speculative statement that

---

[112] See *State v. Wood, supra* note 9.

[113] *Id*.

[114] *Id*.

[f]or instance, if Corral could not have truthfully testi-
fied that he did not physically abuse E.R., but he could
have truthfully testified that he never sexually assaulted
M.R., then trial counsel's ineffective failure to move for
severance chilled his constitutional right to take the stand
and deny the sexual assault charges before the jury.[115]

It is hard to imagine that Corral would have a compelling rea-
son to admit to physical abuse when his theory of defense as to
all the charges was a lack of opportunity and lack of credibility
of the witnesses who disclosed the allegations 5 years hence.
Regardless, this speculative statement is not a sufficiently
specific allegation of the conduct Corral claims constituted
deficient performance by trial counsel.

### b. Spillover Evidence

Corral has sufficiently raised an ineffective assistance claim
that trial counsel was deficient by failing to move to sever on
the ground of the alleged spillover evidence from one charge
to another. Ultimately, however, we find his claim lacks merit.

Corral's premise is that there would be little to no cross-
admissibility of the evidence against him in separate trials on
the separate charges. Thus, he contends that counsel was defi-
cient in not moving to sever under § 29-2002(3), and, relatedly,
that the extent and nature of the spillover evidence against him
in the joined trial means he was prejudiced by counsel's defi-
cient conduct.

We disagree as to the extent of the evidence spillover;
thus, we find no merit to Corral's ultimate conclusions. The
spillover evidence in this case was limited to the details of
the sexual assault of M.R., whereas the child abuse of E.R.
and the general fact that M.R. was sexually assaulted were
cross-admissible.

[37,38] As relevant here, § 27-404 provides:

> (2) Evidence of other crimes, wrongs, or acts is not
> admissible to prove the character of a person in order to

---

[115] Brief for appellant at 25.

show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

Section 27-404(2) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner.[116] However, evidence of other crimes which is relevant for any purpose other than to show the actor's propensity is admissible under § 27-404(2).[117]

[39] Evidence that is offered for a proper purpose is often referred to as having a "special" or "independent" relevance, which means that its relevance does not depend upon its tendency to show propensity.[118] An appellate court's analysis under § 27-404(2) considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.[119]

On many occasions, we have upheld the admission of other bad acts evidence for the proper purpose of explaining the

---

[116] *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010).

[117] *Id.*

[118] *Id.*

[119] *Id.*

victim's late disclosure of the crime charged.[120] Such evidence is relevant to explain a legitimate credibility question related to why a victim has waited to report the abuse.[121]

E.R.'s disclosure of her physical abuse was intricately tied to her learning of Corral's sexual assaults of M.R. and M.R.'s disclosure of the same to their mother and law enforcement. Thus, the fact that Corral sexually assaulted M.R. would be admissible in a separate trial on child abuse for a proper purpose of explaining E.R.'s late disclosure. Only the graphic details of the sexual assaults would have a potential for unfair prejudice that could outweigh their probative value in a separate trial on child abuse.

The evidence of Corral's physical abuse of E.R. would have been admissible for a proper purpose in a separate trial on the charge of sexual assault of M.R. That M.R. witnessed Corral's physical violence toward E.R. explains why M.R. would have believed Corral's threats to harm her and their mother, leading to her delayed disclosure. For a separate trial on the sexual assault charges, the probative value of the details of the physical abuse as witnessed by M.R. would outweigh the potential for unfair prejudice.

As will be explained further, any spillover went in only one direction. Because the cross-admissibility of the trial evidence to the sexual assault charges thereby differs from the cross-admissibility to the child abuse charge, we address them separately in our prejudice analysis.

### i. Sexual Assault Charges

We find that the joinder of the charge of child abuse to the charges of sexual assault did not undermine the jury's convictions on the sexual assault charges, because there was no

---

[120] See *id.* See, also, e.g., *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987); *State v. Hitt*, 207 Neb. 746, 301 N.W.2d 96 (1981).

[121] See 3 Michael H. Graham, Handbook of Federal Evidence § 404:5 (10th ed. 2024).

meaningful "spillover" of the evidence of the physical abuse of E.R., and prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.[122] M.R.'s testimony of the physical abuse of E.R. that she witnessed, relevant to the proper purpose of explaining her late disclosure, was not meaningfully different from the other testimony at trial concerning Corral's abuse of E.R. Because of the cross-admissibility of this evidence, there is no merit to Corral's assertion that the convictions of sexual assault were a result of the ineffective assistance of trial counsel in failing to move to sever the sexual assault charges from the child abuse charge.

### ii. Child Abuse Charge

The analysis of the spillover of the details of the sexual assaults into the evidence relevant to the charge of child abuse of E.R. is more complex, because not all the details of the sexual assaults of M.R. would be necessary for the proper purpose of explaining E.R.'s late disclosure in a separate trial on the charge of child abuse. We expressed concern in *Rocha* that sexual assaults of children present evidence that is "highly volatile" and has "the potential to fan the jury's emotions."[123] While physical abuse can have a similar level of volatility, we acknowledge that, at least in this case, the evidence of the sexual assaults of M.R. was more volatile than the evidence of the physical abuse of E.R.

That is not our only consideration, however. As discussed, the strength of the evidence against Corral on the charge of child abuse of E.R. was in no respect greater than the strength of the evidence against Corral on the charges of sexual assault of M.R., or vice versa. As a result, there was no concern that the jury would bootstrap the evidentiary strength of one charge to support a conviction of the other for which there was less persuasive evidence. Moreover, Corral benefited from

---

[122] *State v. Garcia, supra* note 30.

[123] *State v. Rocha, supra* note 22, 286 Neb. at 270, 836 N.W.2d at 785.

the evidentiary spillover of the defense witness testimony that physical signs of the sexual assaults of M.R. should have been apparent both near the time of the alleged assaults and 5 years later during a physical examination. Any evidence undermining M.R.'s credibility undermined E.R.'s as well.

The only danger of prejudice stemming from the joinder was that the jury would bootstrap its emotions fanned by the sexual abuse of a young child. But, unlike in *Rocha*, the jury was instructed in Corral's trial that the jury "must come to a separate decision regarding each crime." This instruction is like the instruction we held in *Knutson* cured any possible prejudice of the joinder there at issue.[124] Similarly worded instructions to reach a separate decision for each charge have repeatedly been found by this court and the Nebraska Court of Appeals to suffice under the circumstances to prevent prejudice from joinder.[125] As we said in *Knutson*, "[E]ven when the risk of prejudice is high, a court's limiting instructions '"often will suffice to cure any risk of prejudice,"'"[126] because a jury is presumed to follow its instructions.[127] The trial record in this case does not overcome the presumption that the jury followed its instructions to keep separate what was relevant to each charge.[128]

For these reasons, as with his convictions of sexual assault, Corral has failed to show for the conviction of child abuse a reasonable probability that but for his counsel's deficient performance in failing to move to sever, the result would have been different.

---

[124] See *State v. Knutson, supra* note 42.

[125] See, *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). See, also, *State v. Clark*, 21 Neb. App. 581, 842 N.W.2d 151 (2013).

[126] *State v. Knutson, supra* note 42, 288 Neb. at 833, 852 N.W.2d at 317, quoting *State v. Foster, supra* note 33, quoting *Zafiro v. United States, supra* note 78.

[127] *State v. Knutson, supra* note 42.

[128] See *Drew v. United States, supra* note 65.

## 2. Failure to Ask for
## Limiting Instruction

Corral does not acknowledge on appeal that the court instructed the jury it "must come to a separate decision regarding each crime." He thus does not explain how his trial counsel was ineffective by failing to ask for different wording. Because a limiting instruction was given for the joined charges, we find no merit to Corral's assignment of error that trial counsel was ineffective by failing to request a limiting instruction to minimize any prejudice from the joinder of offenses.

## 3. Failure to Object to Hearsay

We turn next to Corral's claims of ineffective assistance of counsel by failing to object to several witnesses' testimony on hearsay grounds and to Walker's testimony on both hearsay and foundation grounds.

Pursuant to Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2024), "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[129] Pursuant to Neb. Rev. Stat. § 27-802 (Reissue 2016), hearsay is not admissible unless otherwise provided for in the Nebraska Evidence Rules, Nebraska statutes, or this court's discovery rules.[130] Hearsay included within hearsay, or "double hearsay," is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.[131] In other words, when an out-of-court statement relates the content of another out-of-court statement, there must be an independent hearsay exception for each statement.[132]

---

[129] See, also, *Clemens v. Emme*, 316 Neb. 777, 7 N.W.3d 166 (2024).

[130] See *id*.

[131] See Neb. Rev. Stat. § 27-805 (Reissue 2016).

[132] *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

Corral argues trial counsel should have objected on hearsay grounds to the mother's testimony of statements M.R. and E.R. allegedly made when disclosing the sexual assaults of M.R. to her. Specifically, Corral challenges the mother's testimony that (1) M.R. had talked to the mother about "something that had happened, that [Corral] had done to [M.R.]"; (2) "[E.R.] told [M.R.] that it was okay, that it was time for her to tell"; and (3) M.R. and E.R. identified Corral as the perpetrator of M.R.'s sexual assaults, particularly the mother's account of the conversation she had with M.R. and E.R.

Corral takes issue with Downey's testimony regarding statements that the mother, M.R., and E.R. made when reporting the sexual assaults, specifically that the mother told him that she had discussed with M.R. and E.R. the difference between "good touch and bad touch" and that E.R. "had encouraged [M.R.] to tell [the mother] about the things that had happened to [M.R.] in the past." Corral also takes issue with Downey's testimony that the mother told him that M.R. and E.R. "had told her that this had happened while [the mother] was at work" and that the only time that she worked outside of the home while living with Corral was "a few months in 2016" when she worked at a hotel. Finally, Corral takes issue with Downey's testimony that he had learned through the mother's report that the alleged sexual assaults occurred at "1509 Willis" in Omaha and that "[the mother] also said that [Corral] was currently living at the house next door to where the abuse had happened . . . in Omaha."

Corral argues counsel should have objected on hearsay and double hearsay grounds to Scheinost's testimony regarding M.R.'s and E.R.'s disclosures of abuse, specifically, Scheinost's testimony that M.R. disclosed the sexual abuse to E.R. and that the mother affirmed both M.R.'s and E.R.'s having disclosed abuse during their interviews.

Corral claims trial counsel should have objected on hearsay grounds to Walker's similar testimony that "[E.R.] disclosed physical abuse" during her forensic interview. Corral further

argues trial counsel should have objected on both foundation and hearsay grounds to Walker's double hearsay testimony where she affirmed that she had spoken to "people" at the mother's previous employers and "receive[d] confirmation that [the mother] did work there during those relevant periods of time" and further affirmed that the information Walker received was "consistent with the hours that were reported to [Walker] by [the mother]."

[40,41] Statements are not hearsay to the extent they are offered for context and coherence of other admissible statements or to explain the course of a series of events.[133] Similarly, statements are not hearsay if the proponent offers them to show their impact on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.[134]

[42,43] Statements made to law enforcement to explain the steps taken in an investigation of a defendant, rather than to prove the truth of the matter asserted, are generally admissible as nonhearsay so long as the probative value of the evidence's nonhearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by an impermissible hearsay use of the statements.[135] Statements made by a child victim of sexual abuse to a forensic interviewer in the chain of medical care may be admissible under Neb. Rev. Stat. § 27-803(3) (Cum. Supp. 2022), even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes.[136]

Under these principles, any objection to the statements Corral complains of on appeal would likely lack merit, such that counsel's failure to make such objections was not deficient conduct.

---

[133] *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024).

[134] *Id*.

[135] *Id*.

[136] *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022).

[44,45] Moreover, as the State points out, all the statements Corral complains of on appeal are cumulative of other testimony that Corral does not challenge as inadmissible. And where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[137] Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.[138]

M.R. and E.R. both testified about their conversation with their mother about disclosing if someone touches them inappropriately. M.R. testified she told their mother about Corral's sexual assaults, and E.R. testified that she had encouraged M.R. to tell their mother what had happened. E.R. also testified that, before their conversation with their mother, M.R. had told E.R. "what [Corral] had done to [M.R.] in his bedroom," which M.R.'s testimony already clarified as Corral's sexually assaulting her on multiple occasions.

M.R. and E.R. testified that Corral would take M.R. into the bedroom while their mother was at work, and M.R. testified that the sexual assaults ceased once their mother quit her job.

The mother testified that she had worked a part-time job in the evenings, from 5 to 8 p.m., starting around April 2016 and ending about a month later. M.R. testified that the mother's evening job was at a hotel.

Walker testified that she contacted the mother's employers to verify her claims of employment and the dates and hours she worked. On cross-examination, Walker testified that she verified the mother's employment with "Mary Jo" at "M & A Enterprises" and learned that the mother had been employed there from March 16 to April 15, 2016, and worked from about 6 to 9 p.m.

---

[137] *State v. Anthony, supra* note 133.

[138] *Id.*

The mother testified that she had lived at "1509 Willis" in Omaha with Corral, M.R., and E.R. M.R. testified that Corral would take her into the bedroom he and the mother shared to sexually assault M.R. Walker and another law enforcement officer testified that Corral was residing next door to where the sexual abuse and physical abuse were alleged to have occurred.

We find no merit to Corral's allegations that his trial counsel was ineffective by failing to object to the specified testimony.

### 4. Failure to Impeach

In his last ineffective assistance claim, Corral argues trial counsel was deficient, and he was prejudiced, through trial counsel's failure to impeach M.R.'s testimony that she did not see "white stuff" come out of Corral's penis during the sexual assaults. Corral alleges that M.R. testified during her deposition that "white stuff" emerged from his penis and sometimes went in her mouth, which contradicts M.R.'s testimony at trial that she did not see anything on or come out of Corral's penis other than her saliva.

[46] The record before us does not include M.R.'s deposition or express statements on the record as to why trial counsel did not impeach M.R. with her deposition testimony on this matter, assuming that her deposition did in fact contradict her testimony at trial. However, decisions about whether to engage in cross-examination, and, if so, to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.[139]

The record shows that Corral's trial counsel rigorously cross-examined M.R., using her deposition to attempt to impeach her testimony regarding matters such as the color of the house in which the alleged abuse occurred, Corral's personality, where M.R. had been after school and on the weekends, and how many days the mother worked per week in March and April

---

[139] *State v. Wood, supra* note 9.

2016. There was little more to be gained by introducing to the jury the graphic details of the sexual assaults as reported in M.R.'s deposition testimony, which could fan the flames of the jury's emotions while having little impact on M.R.'s credibility.

We hold that trial counsel was not ineffective by failing to bring to the jury's attention M.R.'s inconsistent statement that she did, in fact, witness "white stuff," which sometimes went in her mouth, from Corral's penis.

### 5. Court's Ruling on Objection to Walker's Testimony Regarding Late Disclosure

We next address Corral's assertion that the district court erred in overruling his objection during Walker's testimony pertaining to her experience that "a delay of years in . . . disclosure" of sexual abuse "is very common" and that delayed disclosure occurs in "at least 75 percent of [her] cases."

Corral argues there was insufficient evidence of Walker's experience and expertise in delayed disclosures, so she was unqualified to "opine or relate personal experiences regarding delayed disclosures that could be considered helpful to the jurors."[140] Although Corral objected to the State's question based on it calling for expert testimony and speculation, his argument on appeal focuses solely on Walker's being unqualified to testify as an expert in delayed disclosures.

An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[141] Neb. Rev. Stat. § 27-702 (Reissue 2016) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

---

[140] Brief for appellant at 45-46.

[141] *State v. Anthony, supra* note 133.

[47-49] There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert.[142] Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value.[143] A witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.[144] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[145]

During her testimony, Walker was asked if, in her experience, it is uncommon to investigate crimes of sexual abuse where there is a disclosure of abuse that is delayed by years, and Walker stated it is "very common." Corral's trial counsel did not object to this statement.

Only after the prosecution asked, "How common would you say it is as it relates to your cases?" did counsel object on grounds that the question called for expert witness testimony and speculation. The court overruled the objection, and Walker answered that, in her personal experience, "at least 75 percent of [her] cases" had a delayed disclosure component to them.

[50] Walker testified about her own perceptions based on her experience. Generally, to be admissible, a lay witness' opinion must be based on the witness' perception, foundation must establish a rational basis for the opinion, and the testimony must be helpful to the trier of fact.[146]

Even if Walker's testimony is considered an expert opinion, a person may qualify as an expert by virtue of either

---

[142] *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

[143] *Id*.

[144] *Id*.

[145] *State v. Anthony, supra* note 133.

[146] See *id*.

formal training or actual practical experience in the field,[147] and Walker demonstrated both. Walker testified she had been working in the child-victim sexual assault unit for about 2½ years, with approximately 20 to 25 open cases at any given time. Walker testified that she had received training relating to sexual assault and child abuse cases through the police academy, Project Harmony, and the child advocacy center. She usually received 2 days of training each year and was required to participate in about 20 hours of training per year outside of the academy.

Finally, even if Walker's statement was admitted in error, it was cumulative of her testimony that it is "very common" to investigate crimes of sexual abuse where there are delayed disclosures, which testimony Corral did not object to at trial or challenge in his ineffective assistance claims on appeal. Additionally, Walker's testimony was cumulative to Scheinost's testimony that research shows that a "vast majority of children delay disclosing sexual abuse or don't disclose at all," which was also unchallenged at trial and on appeal. Walker's second statement tends to prove the same point as her first statement and Scheinost's testimony, which is that delayed disclosures are common in sexual assault cases. Thus, Walker's second statement was cumulative of properly admitted evidence and the trial court's decision to overrule his objection to Walker's testimony, if error, was harmless.

## VI. CONCLUSION

Because we find neither any trial court error nor ineffective assistance of trial counsel, we find no merit to Corral's assignment of error that the cumulative effect of all errors warrants reversal of his convictions. For the foregoing reasons, we affirm the judgment below.

Affirmed.

---

[147] See, *State v. Wheeler, supra* note 142; *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992).