IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


STATE V. LAMBERT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

STEVEN D. LAMBERT, APPELLANT.


Filed September 16, 2025.    No. A-24-268.


Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Douglas A. Johnson for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.


RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Steven Lambert appeals from his jury convictions and sentences for three counts of first degree sexual assault of a child and one count of third degree sexual assault of a child. Lambert argues that the evidence was insufficient to sustain his convictions, that the district court erred in admitting certain evidence, and that the district court imposed an excessive sentence. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

As relevant to this appeal, in December 2022, the State charged Lambert with three counts of first degree sexual assault of a child, Class IB felonies, and one count of third degree sexual assault of a child, a Class IIIA felony. The charges arose out of allegations by the victim that

- 1 -

Lambert, who was her stepfather, had sexually assaulted her for several years. An additional 11 counts of possession of visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers were severed and are not part of this appeal.

## 2. Pretrial Motions

In November 2023, Lambert filed motions in limine requesting that the court enter an order prohibiting the State from adducing evidence obtained from his cell phone and computers; testimony related to the victim's alleged prior disclosures to Amani S. and Lataija B. of sexual abuse; and testimony related to alleged prior acts of misconduct by Lambert against his child, K.L., including allegations of assault, physical abuse, threats, and/or acts of violent behavior. Lambert further filed a motion to suppress evidence obtained from the search and seizure of his cellphone and laptops, alleging that the evidence was obtained in violation of his constitutional rights.

The court sustained Lambert's request to exclude evidence obtained from Lambert's cell phone and laptops. As it related to the victim's prior disclosures to Amani and Lataija, the court found that:

> Any statements made of this nature by [the victim] to [Amani] upon which [Amani] did not immediately act and take additional steps in a close period of time, as a result of the statements would be hearsay and not qualify under any exception, including effect on the listener. Although the Court would state that if there is evidence that if in a close period of time after a particular statement was made by [the victim] to [Amani] and [Amani] immediately acted and took further steps after that statement, then that statement could qualify as not hearsay, not being offered for the truth of the matter asserted and being only offered for effect upon the listener. Prior statements to [Amani] upon which she did not immediately act, the Court would believe would be hearsay.

The court further advised that if either party wanted to present more specific arguments on the issue during the trial, it would entertain a sidebar in advance of the offer of the testimony. As it related to the alleged prior acts of misconduct against K.L. that Lambert sought to exclude, the district court denied the motion finding that the alleged acts of misconduct were inextricably intertwined with the crimes charged.

## 3. Trial

During the trial, testimony was adduced from Officer Derek Urban, responding officer; Detective Ryan Templeton, investigator; Detective Shawn Pearson, digital forensics unit; the victim; Mary Ellwanger, Project Harmony pediatric nurse practitioner; Amanda Kuszak, Project Harmony forensic interview program manager; Marquita L., the victim's mother; and Amani and Lataija, the victim's cousins.

### (a) Officer Urban's Testimony

Officer Urban testified that on November 28, 2022, he responded to a report of a sexual assault of a juvenile. Upon arriving at the residence, Officer Urban contacted the victim, the

victim's mother, and other family members. Officer Urban testified that he took the initial report and contacted the child victim sexual assault unit.

### (b) Detective Templeton's Testimony

Detective Templeton testified that he was assigned to follow up on the report of sexual assault. Detective Templeton testified that as part of his follow-up investigation, he contacted the victim and the victim's mother, interviewed other family members, and scheduled forensic interviews. Detective Templeton stated that he observed the forensic interviews of the victim and the victim's sister. During the victim's forensic interview, she disclosed several instances of sexual abuse by Lambert occurring in various rooms in at least two homes, with the most recent occurrence in April 2022, around the victim's birthday. The victim disclosed that she believed that Lambert recorded the sexual assaults on his cell phone. Lambert was subsequently arrested and charged with first degree sexual assault of a child. At the time of his arrest, Detective Templeton seized Lambert's cell phone and subsequently obtained a warrant to search the phone. Detective Templeton testified that the Digital Forensics Unit completed an extraction of Lambert's phone, and after reviewing the data extraction, no evidence of child sexual assault material was found on the phone.

### (c) Detective Shawn Pearson's Testimony

Detective Pearson testified that he was employed in the digital forensics unit and completed the extraction of Lambert's cellphone at Detective Templeton's request. Detective Pearson testified that, according to the data extraction, images and videos had been deleted from the cellphone, but he was unable to determine the content of those images or videos.

### (d) Victim's Testimony

The victim testified that she met Lambert when she was about 2 years old. She testified that since her mother had been with Lambert, they had lived in three different places in Nebraska: a townhome, a house on North 55th Avenue, and a house on 113th Street. The victim testified that she believed they lived in the townhome when she was in preschool, lived in the North 55th Avenue house from the time she was in kindergarten to fourth grade, and lived in the 113th Street house from the time she was in 5th grade to the present.

The victim testified that she remembered a time when they were living in the townhouse where Lambert touched her in a way that made her uncomfortable. She testified that Lambert was "rubbing all over me" with his hands under her clothes.

The victim testified that, on more than one occasion while they lived in the North 55th Avenue house, Lambert put his penis inside her mouth. She testified that sometimes he would tell her to move her head back and forth, sometimes he would grab the back of her head, or sometimes he would make his penis "go deep, deep, back in my throat." She stated, "it made me feel like I was scared. And I started to choke and my throat was hurting."

The victim testified that the first time she remembered Lambert putting his penis inside her vagina was when she was 6 years old when they lived in the North 55th Avenue house. The incident took place in the master bedroom before it became her bedroom. Thereafter, the victim

- 3 -

testified that on multiple occasions in the North 55th Avenue house, Lambert put his penis inside her vagina, put his penis inside her mouth, or touched her in ways that made her uncomfortable. She described what usually happened was Lambert

> always had a towel laid on the bed, and like, baby oil and, like, it was dark. He always had a flashlight shining in the air. And he told me, lay down. He also had a wet washcloth. And he would wipe down the vagina and put baby oil and he would stick his penis inside of me.

The victim further testified that Lambert usually covered her face with a blanket, towel, or pillow. She testified, generally, that when this happened, her mother was not home. She testified that there were times that Lambert would pull his penis out of her vagina, and he would "squeeze it, and put it—like the nut-on my stomach or like in my mouth, on my body, wherever he felt like putting it at the time."

The victim testified to one specific incident wherein she remembered being in the basement with her sister and Lambert's other two children from a prior relationship were playing and Lambert told everyone but her to go upstairs. She testified, "[a]nd then he tells me to take my clothes off and come sit on his lap. And, like, with my back against his stomach, so I did." The victim stated that Lambert then "puts his . . . either his index and middle finger or the middle finger and ring finger, and he puts it inside my vagina."

The victim testified to remembering a specific time after her mother and Lambert moved their bedroom from the master bedroom to the basement of the North 55th Avenue house. She testified that she, her sister, and Lambert's two children from a prior relationship were

> watching a movie, and we was playing and talking and stuff. And then he tells me to come downstairs to fold towels and blankets and sheets and stuff like that. So I go down there not knowing. Because when I went down there, there was towels and blankets and stuff. And then I saw a towel laid out with baby oil and a washcloth. Then he tells me to take my clothes off and lay down on my back. And then he starts to wipe down with a washcloth. And so this time he wasn't standing up because we was on the floor, and he was, like, over me. Like, his knees was on the ground and his hands was, like, above me. . .

Thereafter, the victim stated that Lambert "sticks his penis inside me after he puts the baby oil on me and on him. And then he sticks it inside of me, and he starts, like, going forward and backward, forward and backward. And then it would hurt so bad."

The victim stated that "I saw a towel down, but there [were] also towels and stuff that needed to be folded. But he just called me down there so he could rape me." After Lambert finished, he told the victim, "don't tell nobody about this." The victim testified that she listened when he told her not to say anything because she was scared of him because "sometimes, like, if I kept moving backwards trying to move, he had a Nike slide. And he would hold it up and be like, keep moving, I'm going to hit you. But he never hit me." The victim testified that she witnessed Lambert discipline the other children in the house with the Nike sandal, and

> you could hear the hits. And it would sound like it hurt and sounded scary. So I always knew if he was to hit me with that slide, it would hurt real bad. And I never wanted to get hit, and that's why when he told me not to say nothing to anybody, I always listened.

The victim testified to an incident that occurred in the living room in the North 55th Avenue house after Lambert picked her up from church summer camp around the Fourth of July and put his penis inside her vagina. She testified that it was either the summer between third and fourth grade or the summer between fourth and fifth grade.

The victim testified to another incident occurring in the shower at the North 55th Avenue house where Lambert got in the shower with her and told her "to get on my knees, and, like, close my eyes, open my mouth." She testified that she did what he told her "[a]nd then I feel something just going in my mouth and, like, falling out. And it was him peeing in my mouth."

The victim testified that she could not remember how often it would occur at the North 55th Avenue house, but stated, "it was often." At some point, the victim stated that she disclosed what Lambert was doing to her to Amani when she and Amani were at her great-grandmother's house. She testified that she believed she was 8 years old, and Amani was 11 years old.

The victim testified that they moved to the 113th Street house in the summer of 2020 at the end of her fourth grade year. She testified that at the time she started her fifth grade year, her mother was working a day shift job at the school and worked at a bar that her mother opened with her own mother and cousin. The victim testified that, while in the living room and her mother and Lambert's bedroom in the 113th Street house, Lambert touched her in a way that made her feel uncomfortable.

The victim testified to a specific incident where she was on the phone with a friend and Lambert told her to get off the phone to wash the dishes. After she hung up the phone, she started walking down the hallway and she saw Lambert "sitting on the couch with his legs wide open, no towel, no clothes, nothing." She testified that Lambert said, "come here, sit down, and put my penis in your mouth and suck it." She testified that at that time she was sitting "crisscross applesauce." She testified that she believed he was recording it on his cell phone because Lambert was holding his phone and pointing it towards her head and his penis. The victim testified that Lambert put his penis in her mouth on the couch in the living room more than once.

The victim testified to multiple other occasions when Lambert put his penis inside her mouth or in her vagina when they lived in the 113th Street house. The victim testified that she started her menstrual cycle when she was 11 and after she got her cycle, "I could use that as an excuse" because he would not put his penis inside her vagina when she was on her cycle. She testified that even though he would not touch her, "he would still make me suck his penis and stuff even though he couldn't put it inside me." The victim testified generally:

> Since I got my cycle and stuff, he always would make me get in the shower and wash up. But sometimes he would get in there with me, but most times I was just hurry up, wash up, and get out, and just dry off, and he tells me to lay on the bed.
>
> . . . .
>
> . . . He tells me to dry off and lay down on my back on the bed on the towel. And he, like, puts a towel or blanket over my head. And sometimes he would just throw it on there, and it would just be on my face. And sometimes it was hard to breathe, but I would move it though. And when he put the -- like, over my face, he had baby oil. And he put it on me, he put it on him, and then penis in vagina and moved back and forth and stuff.

She testified that usually Lambert would make her lie on her back with her legs open and above her head. She testified that Lambert would put his penis inside her mouth and vagina "when he felt like it." She stated that "sometimes he would take it out and just say put it in your mouth. Like, he would lay on the bed -- he would sit on the bed, and then he would have me stand up or, like, squat down a little bit and put it in my mouth."

The victim testified that on one occasion when she was downstairs playing a game with her sister and Lambert's son, she got tired and fell asleep on the couch. The victim stated that Lambert tapped her and told her to go to bed. After she went to her room, she heard Lambert come down the hallway. He told her to take a shower despite that she already showered while he laid the towel down on the bed. Thereafter, the victim testified that Lambert put his penis inside her vagina.

The victim stated that it happened again when her mother went to Portland. The victim testified that her mother had taken her cell phone away as punishment. After her mother left for Portland, Lambert came into her room holding a phone and told her that if she wanted the phone, she had "to earn it." The victim testified that she tried to give the phone back, but Lambert told her "to come in the room and lay back with my clothes off. And he, like, puts his penis inside of my vagina. And it's uncomfortable, and I'm scared. I don't like it, and I'm ready for it to end."

The victim testified to another time where Lambert put his mouth on her vagina after she got out of the shower and was moving his mouth in "circular motions. He's using his tongue." The victim testified that Lambert had also put a blue and white vibrator in her vagina on at least one occasion.

The victim testified that around the time of her 12th birthday, Lambert called her out of her room and told her to get in the shower and wash up and lay down. She testified that

> it was the same as usual. But this time, maybe a few minutes later, he tells me to get on top of him. And when he was on top, . . . he put it inside of me, then he tells me to move up and down, bounce on it, like, spin around, and stuff like that, and then it hurt. . .

After it was over, the victim testified that Lambert told her, "this is your birthday present."

The next time she remembered something happening to her was a few weeks before the November 2022 gender reveal party and "it was, like, a normal time. It was nothing new." The victim testified that at the gender reveal party, she became annoyed with one of her cousins and yelled at him. Thereafter, Lambert came downstairs and told her to stop yelling at her cousin. The victim stated that she "rolled her eyes at him" and her cousins later asked her why she had an attitude with Lambert, and she disclosed that Lambert had been sexually assaulting her.

The victim testified that at some point, Amani became involved in the conversation and subsequently told Lataija. Lataija then came and got her, and they got in the car and drove to some apartments. Thereafter, the victim testified that she told Lataija, "what I've been through, how long it's been going on for, and why I usually am always, like, mad or sad all the time. . ." Lataija told the victim that she planned to tell the victim's mother the following day over lunch. The victim testified that she went to school the next day but was picked up early. At that point, the victim testified that she knew what was going on. When she got home, she was told to pack clothes for 3

weeks because they would be staying with Lataija's mother. The victim testified that she met with a police officer later that day and told the officer about the sexual assaults.

### (e) Testimony Relating to the
### Forensic Interview and Medical Exam

Kuszak testified that she was the forensic interview program manager at Project Harmony, and although she did not personally conduct the forensic interview of the victim, she did review it. The forensic interviewer did not testify at trial because she was on maternity leave. The court sustained Lambert's objection to the admission of the forensic interview into evidence on confrontation grounds.

Ellwanger testified that in November 2022, she conducted a medical exam of the victim. Ellwanger testified that prior to the exam, she explained her role and the purpose of the exam to the victim. Ellwanger testified that the victim disclosed that Lambert had "been raping" her. Ellwanger testified that the victim disclosed that Lambert put his penis inside her mouth and her vagina, that she was 8 years old the first time Lambert put his penis inside her mouth and her vagina, and that the sexual abuse occurred on more than one occasion. The victim stated that the last time it happened was after her birthday in April 2022. Ellwanger testified that the victim further disclosed that Lambert touched her vagina with his hands and a vibrator. Ellwanger testified that the victim disclosed that Lambert offered her a cell phone in exchange for sex and had taken sexual pictures and videos of her. Ellwanger testified that since the victim reported the last incident occurred in April, an acute exam was not performed as those are generally completed within 120 hours after sexual contact. However, the victim did undergo a urine test to check for sexually transmitted diseases. Ellwanger further stated that the victim declined an anogenital exam, but that even if she had completed one, she would not have expected to find an injury because it "most likely would have been healed with no scarring left at that time."

### (f) Marquita's Testimony

Marquita testified that she met Lambert in 2011, and they were married in August 2013. At that time, the victim was approximately 1 year old, and Lambert was serving in the military. They moved to Arkansas for approximately 9 months before returning to Nebraska in 2014. Marquita testified that they moved into a townhouse near 99th and Fort Street and lived there for approximately a year. Thereafter, they moved into a house on North 55th Avenue where they lived for the next 5 or 6 years until moving to another house on 113th Street.

Marquita testified that when they moved back to Nebraska from Arkansas, Lambert was not working right away, and his employment was inconsistent. However, Marquita testified that she worked part-time as a school custodian until she switched to full time in 2015. Between 2015 and 2020, Marquita testified that she worked from 3 p.m. to 11:30 p.m. and that Lambert cared for the children while she was at work. In 2020, Marquita accepted a new job and began working from 8 a.m. to 4:30 p.m. At that time, she opened a bar with her mother and her cousin which she testified was open every day except Sundays and Mondays. After she finished her day shift job, Marquita testified that she came home and changed clothes to go to work at the bar and would be there somedays until 3 a.m. or 4 a.m.

Marquita testified that she and Lambert had one child together, and at the time that the victim disclosed the sexual abuse, Marquita was pregnant with twins. Marquita testified that Lambert also had two other children from a prior relationship who visited them frequently. Although Lambert was the primary disciplinarian in the house for his children, Marquita testified that he did not discipline the victim. Marquita testified that when Lambert disciplined the other children, he would usually spank them with a Nike slide sandal.

Marquita testified that the gender reveal party was in November 2022. At that time, Lambert was employed at North High School working in IT. Marquita testified that on the day of the gender reveal party she noticed that Lataija stuck around longer than usual and asked her to go to lunch the following day because she had something she wanted to discuss. The following day, Lataija's mother texted her and told her to come to her house for lunch. Marquita testified that when she arrived, Lataija, her mother, and Marquita's sister were there. Marquita testified that they told her what the victim had disclosed the day prior. Thereafter, Marquita had her mother pick up the children early from school so they could go home and pack before Lambert returned from work that day. After they finished packing and returned to Lataija's mother's house, they reported the alleged sexual assaults to law enforcement. Marquita testified that she took the victim and the victim's sister to Project Harmony the following day for forensic interviews.

During the State's direct examination of Marquita, the following colloquy occurred:

Q. Looking back, is there anything that [Lambert] ever did or said that raised a red flag?
[Defense counsel]: Objection: 403, relevance.
THE COURT: Overruled.
THE WITNESS: Anything that he said?
[Prosecutor]:
Q. Yes.
A. Yes
Q. What?
A. A couple of times he's come to me and said that he thought he had a problem.
Q. What do you mean?
A. And I would say, what do you mean by that? And [Lambert] would say that he wanted sex all the time.
Q. And would he ever do anything that would ever raise a red flag? Or did you just not, in your mind looking back, have anything that would ever have raised a red flag?

At that point in Marquita's testimony, defense counsel requested a sidebar. During the sidebar, defense counsel posited the following objections: 403, hearsay, foundation, and relevance. The court overruled the objections. The State then continued direct examination of Marquita and after the State concluded direct examination, the court took a break. During this break, and outside the presence of the jury, defense counsel moved for a mistrial based on Marquita's testimony related to Lambert's "prior sexual promiscuity . . . , acts, [and] deviancy that are clearly 404." The State argued that the testimony related to an admission against Lambert's interests, was relevant, and was not 404 evidence. The court overruled Lambert's motion for mistrial.

- 8 -

### (g) Amani's Testimony

Amani testified that on the day of the gender reveal party, she and some of her cousins, including the victim, were in the basement of the house when the victim disclosed that Lambert had been sexually assaulting her. After the victim's disclosure, Amani told Lataija what the victim had disclosed. Thereafter, Amani testified that Lataija took the victim for a ride in the car to talk.

Amani testified that the gender reveal party was not the first time she heard the victim say that Lambert had been sexually assaulting her. Amani testified that when she was 8 years old, she remembered that she and the victim were at her great-grandmother's house and the victim disclosed that Lambert "put his penis in her vagina." Amani testified that at the time that the victim first made the disclosure to her, she did not tell anyone because "I didn't know who to tell. I didn't know what to do."

### (h) Lataija's Testimony

Lataija testified that she was outside playing basketball when Amani came outside and blurted out that "[Lambert's] been messing with [the victim]." Lataija testified that she and Amani took a walk in the cul-de-sac and Amani explained what the victim had disclosed. After walking back to the house, Lataija testified that she went to the basement to get more details from the victim. Lataija testified that she borrowed her boyfriend's car to take the victim for a ride to talk. Lataija testified that when they got in the car, she drove to an apartment complex and asked the victim to tell her what was going on. Lataija testified that the victim told her:

> When her mom would work at the bar, [Lambert] would call the kids upstairs to go to bed, and then once the kids were kind of asleep . . . he would come into her room and say, "Psst, I have something to tell you."
>
> And she said, "I already know what it is." And she said, "He would tell me to go get in the shower. Take all my clothes off and go get in the shower and he would be in there in a minute."
>
> . . . .
>
> And so she continued to tell me pretty much that after she would get out of the shower -- I mean, she kind of skipped a little bit of detail, but she would say, "He would put it in me."
>
> And I proceeded to ask her, "What would he put in you?" And that's when it kind of got overly emotional, and she just kind of covered her eyes. And I asked her, "Well, did you ever say no?" And she had said, like, closer to her birthday, "He stopped." And she said, "But if -- he said if I ever would make noise, he would hit -- he would threaten me with a sandal," if that makes sense.

Lataija testified that the victim told her that the sexual abuse had been going on for a while. Lataija testified that when she and the victim returned to the house she was concerned that Lambert may have been alerted to what was going on. She testified that:

> When I came in the house, I could see him kind of standing over. Again, I was still overly emotional, and so that was kind of my thought was he probably heard Amani as

soon as she came out the door. Again, the windows were open. And if not, . . . the doorbell was right there for him to be able to hear and play back.

Lataija testified that her goal was to tell Marquita what had been happening, but due to safety issues with guns in the house and concerns that Lambert had been alerted that the victim had disclosed the sexual abuse, she decided to ask Marquita to go to lunch with her the following day. Lataija testified that she and her boyfriend were among the last people to leave the gender reveal party and that after they left, Lataija called her mom. After explaining to her mother what the victim had disclosed, Lataija and her mother began a three-way phone call with Marquita's sister. Lataija testified that the following day, she, her mother, Marquita, and Marquita's sister gathered at her mother's house and told Marquita what happened. Thereafter, they all went back to Marquita's house to pack some clothes so that Marquita, the victim, and the victim's sister could stay at Lataija's mother's house. Lataija testified that shortly after, the victim and the victim's sister arrived with their grandmother who picked them up from school early so they could leave before Lambert got off work.

### 4. VERDICTS AND SENTENCES

In December 2023, the jury returned a verdict finding Lambert guilty of one count of third degree sexual assault of a child, a Class IIIA felony, and three counts of first degree sexual assault of a child, all Class IB felonies.

The sentencing hearing was held in March 2024. The district court sentenced Lambert to a period of 2 to 3 years' imprisonment in connection with his conviction of third degree sexual assault of a child, and 20 to 25 years' imprisonment for each of the three convictions of first degree sexual assault of a child. Counts 1, 2 and 4 were ordered to run concurrently and Counts 2 and 3 were ordered to run consecutively. Lambert was given 470 days for time already served.

Lambert now appeals from his convictions and sentences, represented by the same counsel who represented him during trial.

## III. ASSIGNMENTS OF ERROR

Lambert assigns, renumbered and restated, that (1) the district court erred in admitting (a) testimony from Amani and Lataija regarding alleged prior disclosures by the victim and (b) testimony from the victim and Marquita regarding alleged prior acts and character evidence over his motion in limine and objections during trial; (2) the evidence was insufficient to sustain his convictions; and (3) the district court imposed excessive sentences.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Vazquez,* 319 Neb. 192, 21 N.W.3d 615 (2025). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.*

## V. ANALYSIS

### 1. ADMISSION OF TESTIMONY

Lambert first assigns that the district court erred in admitting testimony from Amani and Lataija about the victim's prior disclosure of sexual assault and in admitting testimony from the victim and Marquita regarding character evidence and prior violent acts by Lambert. We will address those assignments separately.

### (a) Testimony from Amani and Lataija

Lambert first argues that the district court erred in admitting Amani and Lataija's testimony governing the victim's disclosures that Lambert was sexually assaulting her, claiming that the testimony constituted inadmissible hearsay and was unfairly prejudicial to him. Both Amani and Lataija testified, over Lambert's objection, that the victim disclosed during the November 2022 gender reveal party that Lambert had been sexually assaulting her. Amani separately testified, over Lambert's objection, that the victim had previously disclosed to her that Lambert was sexually assaulting her. Lambert argues that the testimony was offered for the truth of the matter asserted and that there was no exception to the hearsay rule which would allow its admission. Lambert additionally argues that the probative value of the statements was outweighed by the unfair prejudice to him.

The Nebraska Supreme Court recently stated in *State v. Corral*, 318 Neb. 940, 987, 20 N.W.3d 372, 409–10 (2025):

> Pursuant to Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2024), "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pursuant to Neb. Rev. Stat. § 27-802 (Reissue 2016), hearsay is not admissible unless otherwise provided for in the Nebraska Evidence Rules, Nebraska statutes, or this court's discovery rules. Hearsay included within hearsay, or "double hearsay," is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules. In other words, when an out-of-court statement relates the content of another out-of-court statement, there must be an independent hearsay exception for each statement.

Additionally, Neb. Rev. Stat. § 27-403 (Reissue 2016) provides that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect. *State v. Moore*, 317 Neb. 493, 10 N.W.3d 531 (2024).

The State argued that the disclosures made by the victim to both Amani and Lataija at the gender reveal party were not offered to prove the truth of the statements, but rather to show the impact on the listeners because following the disclosures, both Amani and Lataija reported the abuse to another individual, which eventually led to the law enforcement investigation. We agree.

Recently in *State v. Corral, supra*, the Nebraska Supreme Court analyzed a similar argument albeit in the context of a claim of ineffective assistance of counsel for failure by counsel to interpose hearsay objections to a victim's disclosure of sexual abuse to multiple individuals, including the victim's mother. In rejecting the ineffective assistance of counsel claim, the court held that

> Statements are not hearsay to the extent they are offered for context and coherence of other admissible statements or to explain the course of a series of events. Similarly, statements are not hearsay if the proponent offers them to show their impact on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.

*Id.*, 318 Neb. at 989, 20 N.W.3d at 410-11.

In this case, the statement was relevant for the nonhearsay purpose to demonstrate the disclosure's effect on the hearers. As a result of the disclosures, Amani relayed the disclosures to Lataija, who relayed the information to her mother, who then relayed the information to the victim's mother, which prompted a report to law enforcement. Both Officer Urban and Detective Templeton testified that the report and investigation ensued as a result of the call to law enforcement reporting the alleged sexual assault. Under these circumstances, we find the testimony was offered for a nonhearsay purpose and the court did not abuse its discretion in admitting it over Lambert's hearsay objection. And insofar as Lambert claims that the relevance of the chain of reporting was outweighed by its prejudicial effect, we reject that claim and find that the testimony was not unfairly prejudicial when it simply provided context for how, after years of abuse, Lambert's conduct was eventually discovered.

As it relates to Amani's additional testimony that, years earlier, the victim had disclosed to her that Lambert was sexually assaulting her, we reach the same result albeit for a different reason. During the trial, the victim testified that, when she was 8 and Amani was 11, she disclosed to Amani that Lambert had been sexually assaulting the victim. Subsequent to the victim's trial testimony, Amani testified regarding the same subject matter. Because the victim previously testified to the substance of Amani's testimony, Amani's testimony on that same subject was cumulative. Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Here, even if Amani's testimony was improperly admitted, a matter we need not decide, her testimony was cumulative

of the victim's testimony. As such, error in the admission of that evidence, if any, was harmless error. This claim fails.

(b) Prior Bad Acts Evidence

Lambert next argues that the court erred in admitting testimony from the victim and Marquita regarding Lambert striking his other children with a Nike slide sandal. Lambert contends that the evidence was improper character evidence offered by the State to show his propensity for violent behavior towards his children and that the evidence as unfairly prejudicial. Lambert also contends that Marquita's testimony that Lambert told her he thought that he had a "problem" with wanting sex all the time was impermissible character evidence and should not have been admitted into evidence.

Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. See *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025). However, evidence of other crimes, wrongs, or acts which are relevant for any purpose other than to show the actor's propensity is admissible under § 27-404(2). *State v. Corral, supra*. Whether evidence is admissible for any proper purpose under the rule governing admissibility of evidence of other crimes, wrongs, or acts rests within the discretion of the trial court. *State v. Moore*, 317 Neb. 493, 10 N.W.3d 531 (2024).

Here, prior to trial, Lambert filed a motion in limine in which he sought to exclude testimony related to alleged prior acts of misconduct by Lambert against another child, arguing that such evidence was not relevant, was improper character evidence, and was unfairly prejudicial. The district court denied the motion in limine as to this issue finding that:

> The Court [is] not informed that this testimony in any way is described by [the victim] as physical abuse or acts of violent behavior by [Lambert]. In addition the Court finds that her observation of this behavior of [Lambert] could be argued to be intrinsic evidence which is inextricably intertwined with the actual crime charged here and foundation for [the victim's] behavior during the time of the alleged commission of the crime.

During the trial, over objection and renewal of Lambert's motion in limine, the victim testified that when Lambert told her not to say anything about the sexual assaults, she listened because she was scared of being hit with a Nike slide. The victim testified that Lambert threatened to hit her with the Nike slide, and although he never followed through on that threat, she was afraid of the punishment, having observed Lambert strike the other children when they got in trouble. The victim testified, "you could hear the hits. And it would sound like it hurt and sounded scary. So I always knew if he was to hit me with that slide, it would hurt real bad." Marquita also testified that Lambert disciplined his children by spanking them with a Nike slide slip-on shoe. When asked whether Marquita thought the discipline towards Lambert's other children was excessive, Lambert objected based on his motion in limine, which the district court overruled. Marquita testified that Lambert's discipline of his two other children from a prior relationship caused her some concern.

Based on our review of the record, the testimony from the victim and Marquita had relevance other than to show propensity. During the trial, Lambert attempted to argue that the victim recently fabricated the sexual assault allegations because she was upset about her mother's

- 13 -

recent pregnancy. In response, the State offered testimony from the victim that the reason she did not previously disclose Lambert's long-term abuse was because of Lambert's threats and having witnessed Lambert discipline his other children by hitting them with the Nike slide. Marquita's testimony corroborated the victim's testimony that Lambert disciplined his other children by hitting them with the Nike slide. The testimony was offered to rebut the defense and provide an explanation as to why the victim had not disclosed the sexual abuse previously. Because the evidence was offered for a purpose other than to show Lambert's propensity to act in a violent manner, the district court did not err in finding that the aforementioned testimony was not violative of rule § 27-404(2).

But the fact that the evidence was not offered for its propensity does not end our inquiry. As the Nebraska Supreme Court set forth in *State v. Moore*, 317 Neb. 493, 511–12, 10 N.W.3d 531, 545 (2024):

> Evidence that is admissible under rule 404(2) may nevertheless be excluded under rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case. Generally, prior bad act evidence has probative value when it is related in time, place, and/or circumstances to the offense or offenses charged.

> Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. The fact that evidence is prejudicial is not enough to require exclusion under rule 403 because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under rule 403. In other words, unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from the proof specific to the offense charged, commonly on an emotional basis.

Here, the testimony suggested a reason why the victim delayed disclosing the alleged sexual abuse and was offered to rebut Lambert's suggestion that the victim recently fabricated the story, which was why she never previously disclosed it. In that regard, the evidence's probative value was high in relation to any suggestion that the evidence itself could lead the jury to declare guilt on a different ground that the offense charged. We find that the evidence was not unfairly prejudicial to Lambert.

Lambert has also argued that Marquita's testimony regarding his alleged "problem" of "want[ing] sex all the time" was inadmissible hearsay evidence, improper character evidence, and was unduly prejudicial. During the trial, the State asked Marquita if Lambert ever said anything that raised a "red flag" in relation to the allegations against him. In response, Marquita testified that on a couple of occasions, Lambert had come to her and said that he had a problem because he wanted sex all the time. Lambert's counsel objected to the State's question based on 403, 404, hearsay, foundation, and relevance grounds. Lambert's counsel also sought to strike the testimony regarding the topic involving "adult sex and having a sex addiction or wanting to have sex a lot." Shortly thereafter, over Lambert's objections, Marquita testified that she "sometimes" had

concerns leaving the victim with Lambert. During a break, Lambert's counsel subsequently made an oral motion for a mistrial, arguing that Marquita's testimony was improper 404 evidence as the State failed to file a pretrial motion based on the State's intent to offer Marquita's testimony about Lambert's alleged sexual deviancy. The State argued that the testimony was not 404 evidence and amounted to an admission against Lambert's interests. The court overruled Lambert's motion for a mistrial.

Insofar as Lambert is attempting to argue that the district court erred in not granting his motion for mistrial in relation to this line of questioning, that issue was not assigned as error and will not be considered on appeal. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued. *State v. Boppre*, 315 Neb. 203, 995 N.W.2d 28 (2023). Instead, Lambert argues that Marquita's response constituted improper propensity evidence and was unfairly prejudicial to him and compromised him at trial. We fail to see how a statement from Lambert's spouse governing his appetite for sex would constitute "evidence of other crimes, wrongs, or acts" as contemplated by rule 404(2). But assuming, without deciding, that it somehow does, the Nebraska Supreme Court has consistently stated that in order to constitute reversible error, the admission of evidence must be prejudicial to the defendant. In *State v. Lenhart*, 317 Neb. 787, 797, 11 N.W.3d 661, 669–70 (2024), the Nebraska Supreme Court more explicitly stated:

> Our harmless error jurisprudence recognizes that not all trial errors entitle a criminal defendant to the reversal of an adverse trial result. An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case. *State v. Kidder*, 299 Neb. 232, 908 N.W.2d 1 (2018). In other words, harmless error review looks to the basis on which the jury actually rested its verdict. *Id*. In conducting this analysis, an appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt. *Id*. Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless. *Id*. An additional consideration is whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence. *Id*

Having reviewed the entirety of this record, including but not limited to the explicit detailed statements by the victim of the multiple times she was sexually assaulted by Lambert, we find the guilty verdicts rendered were surely unattributable to the limited testimony by Marquita regarding her husband's statements governing his desire for sex or having a strong sex drive in general. Stated differently, regardless of the relevance of Lambert's sex drive in general, we reject Lambert's contention that the statement unfairly prejudiced him in this trial or in any way led to

his conviction here. See *State v. Lenhart, supra* (finding sexually explicit message admitted into evidence did not indicate that jury was influenced by circumstances, either individually or in combination with other evidence). This assignment of error fails.

2. SUFFICIENCY OF EVIDENCE

Lambert next assigns that the evidence was insufficient to support his convictions of one count of third degree sexual assault of a child and three counts of first degree sexual assault of a child. Lambert argues that there was no physical or digital evidence of any alleged sexual assault, and that the testimony of the alleged assaults during the trial was inconsistent and contradictory. Lambert generally argues that the victim's trial testimony was inconsistent with her forensic interview and deposition testimony, and that these inconsistencies show that the victim's testimony was not reliable and did not support his convictions beyond a reasonable doubt.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Here, Lambert was convicted of one count of third degree sexual assault of a child and three counts of first degree sexual assault of a child. As charged in the third amended information, Lambert committed the offense of third degree sexual assault on a child if he submitted the victim, who was 14 years of age or younger to sexual contact not causing serious personal injury and Lambert was at least 19 years of age or older. See Neb. Rev. Stat. § 28-320.01(1) and (3) (Reissue 2016).

First degree sexual assault of a child, Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016) provides in relevant part that:

(1) A person commits sexual assault of a child in the first degree:

(a) When he or she subjects another person under twelve years of age to sexual penetration and the actor is at least nineteen years of age or older; or

(b) When he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older.

Here, the victim, who was 13 years old at the time of the trial, testified that Lambert touched her vagina with his hands, mouth, and penis, and that he made her put her mouth on his penis. The victim testified that the first time Lambert touched her in a way that made her uncomfortable, she was 6 years old, and that the first time he penetrated her mouth and vagina with his penis, she was 8 years old. The victim testified that this occurred on more than one occasion until November 2022. Lambert was born in December 1988, and therefore, he was over the age of 19 at the time of the alleged assaults and was, in fact, over the age of 25 as required for one count of first degree sexual assault of a child.

Although Lambert argues that there was no physical evidence corroborating the victim's allegations, "[s]ince 1989, the State has not been required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's testimony alone is sufficient." *State v. Anders*, 311 Neb. 958, 974, 977 N.W.2d 234, 249 (2022). See Neb. Rev. Stat. § 29-2028 (Reissue 2016) (testimony of person who is victim of sexual assault as defined in §§ 28-319 to 28-320.01 shall not require corroboration). Lambert essentially asks this court to resolve conflicts in the evidence and make a different credibility determination. But that is not the appellate court's function. The jury was tasked with determining the credibility of a witness based upon the entirety of the witness' testimony and it is not the role of the appellate court to question the jury's determination in that regard. Having reviewed the victim's testimony in the light most favorable to the State, the victim unequivocally testified to multiple acts of sexual assault, which satisfied the elements of the charges brought against Lambert. Accordingly, we find no error in the district court's finding that the evidence was sufficient to sustain Lambert's convictions for third degree sexual assault of a child and first degree sexual assault of a child.

### 3. EXCESSIVE SENTENCES

Lambert assigns that the district court erred in imposing excessive sentences. Lambert argues that the district court improperly considered the sentencing factors, including Lambert's character, education, mental health, past trauma, his lack of criminal record, his moderate to low risk to reoffend, and his commitment to bettering himself.

Here, Lambert was convicted of one count of third degree sexual assault of a child which is a Class IIIA felony punishable by up to 3 years' imprisonment and 18 months' post-release supervision, a $10,000 fine, or both; and three counts of first degree sexual assault of a child, Class IB felonies punishable by a minimum of 20 years' imprisonment and a maximum of life in prison. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). Additionally, § 28-319.01 provides that first degree sexual assault of a child "is a Class IB felony with a mandatory minimum sentence of fifteen years in prison for the first offense."

Lambert does not contest that his sentences were within the statutory limits; rather, he argues that the court failed to consider the appropriate sentencing factors. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. A sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

The district court, in fashioning a sentence, stated:

I've considered all the elements in the areas that the courts in the state of Nebraska suggest that a judge does in putting together a sentence. And those include, amongst many things, . . . a person's record, a person's age, whether there's violence, whether there's firearms used, whether there's a victim involved in these matters, meaning a personal victim versus just a society victim, as well as, sir, the seriousness of the charge, and of the conviction. I've considered all that, sir. And I've gone through your [presentence investigation report] a couple of times or better, and it has quite a bit of -- it's quite thick, and they did a thorough job in that respect.

. . . .

So when I consider all this, sir, I have extremely serious crimes. As counsel for the State said, about as serious as they come. The jury found you guilty. I have a young person who's been severely harmed. And in my experience, and my education, and things in this job, and what have you, is that harm is going to last for the rest of her life. And that it's very, very tough. I mean, it's as tough as you can get. So these are very serious charges, sir.

At the time of his sentence, Lambert was 35 years old, was separated, and had five dependents. Prior to his arrest, Lambert received two bachelor's degrees, previously served in the military from 2007 to 2014, and was employed at North High School in the IT department. His criminal history included a conviction for criminal mischief $500 to $1,500. At the time of the PSR, the 11 counts of possession of child pornography that were initially included on the State's third amended information in this case were still pending. The level of service/case management inventory assessment placed Lambert as a high risk to reoffend. The Sex Offender Treatment and Intervention and Progress Scale assessment also assessed Lambert as a high risk to reoffend. The PSR noted that Lambert disclosed being sexually assaulted by a relative when he was a teenager, and he receives treatment for depression and anxiety. The PSR recommended a sentence of incarceration given the seriousness of the crimes and Lambert's lack of remorse.

Based on factors including that the sentences imposed are within the applicable statutory sentencing ranges, Lambert's criminal history, Lambert's high risk to reoffend, the seriousness and nature of the offenses, the harm caused to the victim, and Lambert's lack of remorse, the district court did not abuse its discretion in the sentences imposed. This assignment of error fails.

## VI. CONCLUSION

Having considered and rejected Lambert's assigned errors, we affirm his convictions and sentences.

AFFIRMED.